SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

SLOCUM, GORDON, & CO.;  John
J. Slocum, Jr.;  and Jeffrey L.
Gordon, Defendants.

C.A. No.  02–367L.

United States District Court,
D. Rhode Island.

Sept. 28, 2004.

Luke T. Cadigan, Esq., Dawn A. Edick, Esq., Frank Huntington, Esq., Beth Leh-

man, Esq., Ian D. Roffman, Esq., Boston, MA, for Plaintiff.

Deming E. Sherman, Esq., Patricia A. Sullivan, Esq., Annemarie M. Carney, Edwards & Angell, Providence, RI, for Defendants.

## DECISION AND ORDER

LAGUEUX, Senior District Judge.

The Plaintiff in this case, the Securities and Exchange Commission ("SEC" or "Commission") brought a civil suit against the investment firm of Slocum, Gordon, & Co. ("SG & C") and its two founding partners, John J. Slocum, Jr. ("Slocum") and Jeffrey L. Gordon ("Gordon"). The Commission's chief allegation against these Defendants is that they defrauded both the SEC and their clients between the years 1996 and 2000 through a practice commonly called "cherry picking," whereby certain stocks were initially purchased for clients and later re-allocated to the SG & C firm account if the stocks went up in value prior to the settlement date.

In addition to the Commission's cherry picking allegations, the SEC claims that Defendants engaged in fraudulent or deceptive conduct by a registered investment advisor by improperly commingling client funds and securities with firm funds and securities, breaching its record-keeping requirements, and making material misrepresentations and omissions, both in interactions with clients and in filings with the SEC. According to the Commission, Defendants' conduct and office practices resulted in violations of federal securities laws. The SEC also asserts separate claims against Defendants Slocum and Gordon, alleging that they individually aided and abetted all securities violations committed by their firm.[1]

These various claims make up an eight count complaint filed by the Commission, alleging violations of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), the Securities Exchange Act of 1934 ("Exchange Act") 15 U.S.C. § 78j(b), and the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b–4, 80b–6(1)–(4), and 80b–7. The SEC also alleges violations of certain regulations promulgated under these statutory provisions. See 17 C.F.R. §§ 240.10b–5; 275.204–2(a)(3); and 275.206(4)–2(a)(2).[2]

---

1. Counts 1 and 2 are alleged against all three Defendants, SG & C, Slocum, and Gordon. Counts 3, 4, and 5 are alleged only against SG & C. Count 6, regarding the ADV reports filed with the Commission, is alleged against SG & C and Gordon. Count 7, a claim alleging aiding and abetting, is averred against Defendants Slocum and Gordon. Count 8, another aiding and abetting claim related to SG & C's alleged misrepresentations and omissions on ADV reports filed with the SEC, is alleged as to Slocum alone.

2. The Commission's Complaint asserts eight counts of federal securities violations against the Defendants. Count 1 alleges securities fraud in violation of Section 17(a) of the Securities Act. See 15 U.S.C. § 77q(a). Count 2 alleges securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10–b–5 thereunder. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. Count 3 alleges breach of fiduciary duty in violation of Sections 206(1) and 206(2) of the Advisers Act. See 15 U.S.C. §§ 80b–6(1) and 80b–6(2). Count 4 asserts fraudulent or deceptive conduct by an investment adviser in violation of Section 206(4) of the Advisers Act and Rule 206(4)–2(a)(2) thereunder. See 15 U.S.C. § 80b–6(4); 17 C.F.R. § 275.206(4)–2(a)(2). Count 5 alleges failure to maintain required records of securities transactions, in violation of Section 204 of the Advisers Act and Rule 204–2(a)(3) thereunder. See 15 U.S.C. § 80b–4; 17 C.F.R. § 275.204–2(a)(3). Count 6 asserts material misrepresentations and omissions in filings with the Commission, in violation of Section 207 of the Advisers Act. See 15 U.S.C. § 80b–7. Counts 7 and 8 are aiding and abetting counts against Slocum and Gordon.

Although plead generically in the Commission's complaint, it is helpful for this writer to further categorize these different counts as they relate to the various forms of fraud alleged against Defendants. Counts 1 and 2 are counts under the anti-fraud sections of the Securities Act and the Exchange Act, and relate only to the SEC's allegations of securities fraud by way of cherry picking favorable securities for the firm's benefit. Counts 3, 4, 5, and 6 are brought under the Advisers Act, and are technical counts regarding organizational structure of the firm's account system, its operation practices during the relevant time period, and the Defendants' obligation as fiduciaries to disclose material facts to their clients and the SEC. Counts 7 and 8 are aiding and abetting counts, and, as such, only apply if liability is found under one or more of the other claims in the Commission's complaint.

After conducting a trial in this case without a jury, and then reviewing the trial testimony, exhibits, and the parties' post-trial submissions, the Court now renders a decision in this case. As to Counts 1, 2, 5, 6, 7, and 8, the Court finds that the Commission failed to meet its burden of proof, and renders a decision on these counts in favor of Defendants. However, for the reasons articulated herein, the Court finds in favor of the Commission on Count 4 and in part on Count 3. Based on the evidence submitted, the Court concludes that Defendants did improperly commingle client funds and securities with firm funds and securities, in violation of Section 206(4) of the Advisers Act and Rule 206(4)–2(a)(2) thereunder. *See* 15 U.S.C. § 80b–6(4); 17 C.F.R. § 275.206(4)–2(a)(2). Although this technical violation was not willful, the Court finds that the commingling of client and firm assets created a potential conflict of interest, which Defendants, as fiduciaries, were required to disclose to their clients regardless of their lack of intent to

defraud. *See SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 196–97, 84 S.Ct. 275, 11 L.Ed.2d 237(1963). As a result, the Court finds that Defendants engaged in a course of business which "operated as a fraud" upon their clients, in violation of Section 206(2) of the Advisers Act. 15 U.S.C. § 80b–6(2).

I. *Bench Trial Standard*

Following a bench trial, "the court shall find the facts specifically and state separately its conclusions of law thereon," before proceeding to enter judgment. Fed. R.Civ.P. 52(a); *see also Cafe La France, Inc. v. Schneider Securities, Inc.,* 281 F.Supp.2d 361, 363 (D.R.I.2003). In making its factual findings, it is appropriate for the Court to weigh the credibility of the witnesses presented. Fed.R.Civ.P. 52(a); *see also Gautieri v. U.S.,* 167 F.Supp.2d 207, 209 (D.R.I.2001). Having thus articulated the legal standard, the Court proceeds to make its findings of fact and conclusions of law based on the evidence presented.

II. *Findings of Fact*

Due to its importance to the facts in this case, this writer deems it necessary to explain the company infrastructure in place at SG & C between 1996 and 2000 with great detail and specificity. As a result, the Court's findings of fact are bifurcated into two sections. In Part One, the Court will find facts relating to the establishment, operation, and account structure of SG & C during the relevant time period. This section will provide the necessary background for understanding the technical issues in this case. In Part Two, the Court will find facts relating to the SEC's examination, investigation, and the specific transactions before the Court for scrutiny.

*PART ONE: BACKGROUND*

A. *The Firm Profile*

SG & C is a small investment advising firm registered under the federal Advisers Act, 15 U.S.C. § 80a–1 *et seq.*, as amended. The firm's only office is located at 39 Mill Street, Newport, Rhode Island. Slocum and Gordon, the firm's two founders, and Defendants in this cause of action, established the investment company in late 1978 and registered it with the Commission in January 1979. From its inception, SG & C was a small-scale, old-fashioned investment firm, seeking to provide personalized investment services to the "middle market," or mid-sized, investment accounts.

Over its years of operation, SG & C managed investment accounts for individual clients, families, and charitable organizations in the Newport area. The company also handled personal trades for firm partners, former partners, and their close family members. SG & C offered their clients many different types of investment services, ranging from placing trades to paying bills. In some cases, SG & C even prepared their clients' tax returns. By offering customized services to meet their individual client's needs, and largely by word-of-mouth advertising, SG & C was able to attract and retain a large client base in the Newport area. Approximately 75 to 80 percent of the firm's revenue came from providing portfolio management and other services to clients.

In addition to these various client accounts, SG & C maintained a firm trading account ("trading account"), which provided the remaining 25 to 20 percent of the firm's annual revenue. The trading account benefitted the firm, and, in turn, the partners, who each received a percentage of the firm's annual profits. In addition, profits gleaned from the trading account were used to offset errors made in client trades. Although all investment advisers working at SG & C had the opportunity to make trades for the firm trading account, only Slocum and Gordon actually engaged in firm trades.

B. *Partners and Employees*

At the time of trial, SG & C was comprised of three partners, Slocum, Gordon, and Barclay Douglas, Jr. ("Douglas"). A fourth partner, Jane Lippincott ("Lippincott"), was also affiliated with SG & C during part of the time period at issue; however, she left SG & C to open her own investment firm on January 2, 2000. In addition to these partners, SG & C maintained two office employees between 1996 and 2000: LuAnn Shoemaker ("Shoemaker"), the firm's Operations Manager, and Kimberly Stahm ("Stahm"), a secretary/receptionist.

1. *Investment Advising and Portfolio Management*

Although SG & C's partners and employees described themselves as wearing many different hats in the course of their daily firm activities, each person working for SG & C had his or her own individual responsibilities. Slocum and Gordon acted as investment portfolio managers for the majority of the firm's client base between 1996 and 2000, and were also responsible for trades done for the firm's benefit in its trading account. In addition to these duties, Gordon was the firm's managing partner, and was responsible for overseeing the firm's budget, dealing with financial issues, and overseeing the firm's tax preparation on an annual basis. Gordon was also responsible for insuring SEC compliance by updating and filing the required ADV Form with the SEC annually.

During this time period, Lippincott also acted as an investment portfolio manager for approximately ten percent of SG & C's

client accounts. In addition to her work on these accounts, Lippincott assisted Slocum in managing about a quarter of his client accounts, prepared individual tax returns for clients, and worked on creating a computer database of corporate research information coming into the firm. Lippincott did not engage in any securities trades for the firm during her tenure as a partner, and confined her trading activities to her client accounts and personal accounts.

### 2. Firm Operations

Douglas was the partner in charge of operations, and he oversaw and managed the firm's operations department. Douglas was responsible for maintaining firm accounts, client accounts, and recording all day-to-day transactions. He also oversaw the firm's record keeping and supervised the flow of cash from both client accounts and the firm's line of credit through its clearing account and custodial account when the other partners purchased firm or client securities. Between 1996 and 2000 Douglas worked strictly in operations, and did not engage in any form of securities trading for clients or the firm. As a result, he is not joined as a Defendant in this cause of action.

Also assisting in SG & C's firm operations were Shoemaker and Stahm. Shoemaker, the firm's Operations Manager, worked under Douglas' direction, and oversaw the settlement of securities transactions, distribution of funds to clients, and communicated with banks regarding both firm and client transactions. As Operations Manager, Shoemaker handled the paperwork associated with virtually every security transaction taking place at SG & C during the relevant time period. Stahm served as a secretary and receptionist, and, although she would lend a hand as necessary, she was not intimately involved in the firm's operations. At the time of trial, both Shoemaker and Stahm were still employees of SG & C.

### C. Trading Strategies at SG & C

During the time period in question, SG & C employed two different trading strategies for securities transactions depending on whether the trade was for clients or the firm account. At trial, Defendants Slocum and Gordon outlined these two distinct trading strategies in detail.

### 1. Trading for Clients

Defendants Slocum and Gordon both testified that the majority of their clients were generally interested in conservative, long-term investments. As a result, Slocum and Gordon's policy for client trades was to "buy on weakness and sell on strength" after a significant holding period. At the core of this philosophy was the concept of strategically investing client funds to promote returns while minimizing risk.

To facilitate their long-term holding strategy for client trades, Slocum and Gordon would follow the market constantly, receiving information from Reuter's, from individual stock brokers, from periodicals, and from conversations with larger investment firms. Using these different sources, Slocum and Gordon would scour the market seeking securities that were appropriately positioned for long-term investments in their different clients' accounts. When they determined that a security was properly positioned for such a long-term investment, SG & C would initiate a purchase for its clients.

Although they both engaged in long-term holdings for client trades, the two partners used different methods for choosing appropriate securities. This was largely due to the different types of accounts and client needs at issue. The clients advised by Gordon were generally

income-oriented, often requiring a monthly remittance for their regular expenses. Accordingly, Gordon was usually interested in securities with a high dividend yield, and sometimes strategically purchased securities to take advantage of ex-dividend dates. Gordon also tried to capitalize on periods of market weakness, hoping to buy shares at a low price and then sell later at a higher price. In contrast, Slocum's client-base was more growth-oriented, and less focused on receiving a monthly remittance from their stock investments. As a result, Slocum based his investment decisions for clients on research indicating that a company was in a solid, growth-oriented mode. When a security fit this description, Slocum would purchase a position for his clients tailored to meet their individual needs regarding cash flow, tax consequences, interest, and his client's attitude towards risk.

Gordon testified that his client purchases were always intended as long-term investments, meaning that he would try to buy a stock on weakness with the intention of holding the security over an extended period until its price increased enough to generate the desired rate of return. This desired rate of return, according to Gordon, was typically in the neighborhood of ten percent.

If a security began to rise in price more quickly than originally anticipated, thus achieving the desired rate of return after only a short period of time, the two investment advisers would sell the client security prematurely. Slocum explained that he would sometimes sell a client security earlier than he originally intended if the stock began to decline in value or met his price goals early. Gordon testified that regardless of the reason to sell early, the investment advisers considered such a trade a "short-term holding" rather than a "short-term trade." Slocum and Gordon both testified that they generally refrained from engaging in short-term trades, also known as momentum trades, for most clients, because they considered these trades risky and contrary to the clients' conservative investment goals.[3] Indeed, between the years 1996 and 2000, 98% of SG & C's client trades were long term holdings. *See* Exhibit 8. During the time period at issue, SG & C was very successful in its long-term client investments, in some cases generating as much as a 95% return for their clients. *See* Defendants' Post Trial Memorandum at 3.

## 2. *Trading for the Firm*

When trading for their firm account, however, SG & C investment advisers employed a different strategy. SG & C took advantage of anticipated market surges by engaging in short-term, momentum trades for their firm trading account. Both Slocum and Gordon testified that the decision to make a firm trade was event-driven. If circumstances arose that led Slocum or Gordon to anticipate that a particular company's stock was going to suddenly go up in price, Slocum and Gordon would initiate a purchase of the security for the firm's trading account.

Both Slocum and Gordon testified that they relied on publically available information in deciding to engage in a firm trade. Although both investment advisers employed the same short-term, momentum

---

**3.** Slocum also testified that a small number of his clients were less risk-adverse, and would not have objected to short-term trades for their accounts. These clients were Slocum's family members, the personal accounts of John Howard, a retired partner of SG & C, and Howard's wife. Slocum testified that he occasionally placed short-term trades benefitting these accounts because it was within the trading and risk parameters designated by those particular clients.

philosophy for firm trading, Slocum and Gordon employed somewhat different methods for choosing which securities to purchase. Slocum testified that while both he and Gordon generally engaged in the same type of trading for the firm account, he and his partner weighed certain factors differently in selecting securities for firm trades. Slocum would look at public events and their possible effect on stock prices, such as earning releases or other events that might attract attention to a particular company, and then base his determination to engage in a firm trade on a prediction as to the outcome of these events. Gordon testified that he would most often attempt to buy stocks for the firm during a perceived upward momentum in the stock over a period of time, trying to participate in an upward move as it was occurring. Slocum also testified that sometimes he would purchase a security for the firm before purchasing it for clients to "test the water" and see if the security would be a profitable investment. As a result, sometimes SG & C would purchase a security for the firm and then later, under different market conditions, purchase a position in the same security for their clients. Both Slocum and Gordon would execute firm trades independently from each other, and there was no requirement that the two advisers discuss their decision to engage in a particular firm trade with the other partners.

The firm trades were financed through money borrowed from the firm's line of credit at Sovereign Bank, and were typically held for no more than three days after the day of purchase before being sold. In every case, firm trades were sold before settlement, which occurred on the third day after the purchase or sale of a security, and is the date on which payment for the transaction is due. Because SG & C's firm trades were event-driven, they occurred irregularly: at times firm trades occurred weekly, at other times firm trades did not occur for months at a time. Generally, though, over the time period in question both Slocum and Gordon together averaged less than one firm trade per week.

Typically, SG & C generated under $5,000 in profit for their firm from any single firm trade. However, during the unusual "seismic bull market" of the late 1990s, SG & C's firm trades were very successful. Between 1996 and 2000, SG & C maintained a 98% success rate on their firm trades, resulting in an aggregate profit of $1,253,246 for SG & C.

D. *Placement of Trades and Documentation*

When the investment advisers at SG & C made a security purchase or sale for their clients or for the firm, there was a set process established within the firm for facilitating and recording the transaction. Both Slocum and Gordon testified that the first step in any security transaction at SG & C was identifying an appropriate security for either a firm or a client trade, using the criteria outlined above. Next, the investment advisers testified that they would determine which entity (the firm or particular clients) was going to purchase the particular security. When dealing with client accounts, this decision was made on an account-by-account basis after Slocum and Gordon considered the particular trading criteria each different client had established for their account. Both Slocum and Gordon testified that they would typically generate rough drafts, or other notes describing the transaction and working out the appropriate client list for the trade. These rough drafts or scratch sheets were not retained by SG & C after the business day, and were never made a part of their business records. Ultimately, however, Slocum and Gordon testified that they

would generate a rough list of the client accounts intended to participate in a particular transaction and the particular dollar value of shares appropriate for each intended client's purchase. Typically, Slocum and Gordon would purchase positions in securities, or round lots made up of multiple thousand-share blocks, and the accompanying client list would describe what portion of this larger block was intended for a particular client.

Once the stock was identified and a rough draft of a client list prepared, or, for a firm trade, the decision to place the trade was made, Slocum and Gordon would call a broker and initiate a purchase. The firm used multiple brokers, all of whom would get a commission on the trade per security. At this point in time, Slocum and Gordon would have to specify to the broker whether they wanted a market order, a limit order, or a market-not-held order.

As the witnesses testified, a market order instructed the broker to simply buy the number of shares Slocum or Gordon requested at whatever the current market price was at the time. A limit order instructed the broker to order a specific stock at a specific price, and required the broker to refrain from initiating a purchase until the requested purchase price could be achieved. Market-not-held orders instructed the broker to purchase the security at the market price, but allowed the individual broker to use his or her own discretion to determine the moment of sale if a price was fluctuating. Gordon testified that he generally used limit orders for client trades and market orders for firm trades. Gordon also testified that sometimes for firm trades he would instruct the broker to simply purchase a particular offering of stock at the asking price. In these situations, Gordon would utilize a limit order for a firm trade. Slocum never testified as to his ordering preferences.

Once the call to the broker was made, Slocum and Gordon would take a blank "transaction entry form" ("TE form"), a generic form created by SG & C for all security transactions, and fill out the top portion of the form, indicating the date, the security traded, the purchase, the number of shares, the nature of the order (market, limit, or market-not-held), and the broker with whom they were dealing. While Slocum and Gordon would often handwrite the necessary data on the top portion of the TE form themselves, they would sometimes be too busy to do so, and would ask Shoemaker to fill out the form for them. In these cases, Slocum or Gordon would provide Shoemaker with either their rough draft notes of the transaction or explain the details of the transaction to her orally, and she would handwrite the appropriate information on the top portion of the TE form.

It is important to note that at this point in time the transaction to purchase the security was not complete. When purchasing a security, SG & C investment advisers did not consider a purchase or sale truly initiated until the broker called SG & C with an "execution," which is the exact price at which the trade was effectuated and the number of shares purchased. Generally the broker would call back before the market closed on that same day with the execution, confirming that the trade was made. Gordon testified that while sometimes the broker would give him the execution immediately when he initially placed the order, other times it would take minutes or hours for the broker to call SG & C with the execution. When the broker called back, anyone at SG & C who answered the phone might receive the execution information. Often, this information was received by Shoemak-

er or Stahm, and they would either forward it to the appropriate investment adviser or write the execution information on the TE form themselves. Sometimes the broker would call back and say, "Nothing done," indicating that no trade could be effectuated. In these situations, because the purchase or sell never actually took place, Slocum and Gordon not only considered the transaction aborted, but, rather, that it "ceased to exist." Consequently, because Slocum and Gordon did not consider a transaction initiated until a positive execution was received, the TE form memorializing the transaction was not completely filled out until the execution came back from the broker.

When a positive execution was received, indicating that a security trade was in progress, the TE form would be completed in full. There were several ways that this was accomplished at SG & C. The first possible method was for the investment adviser to personally handwrite all the necessary information, including all client names and their account numbers, or firm information, on the TE form. This happened on some occasions, especially when a security transaction was simple and easy to describe. The second possible method, utilized frequently by Gordon, was entering client data on a computerized version of the TE form he created on his personal computer. Gordon testified that he used his spread-sheet style, computerized TE form for the majority of his client transactions, and would handwrite the TE forms only for simple client transactions or for some firm transactions. Slocum was not successful in his attempts to make use of the computerized TE form, so he rarely employed this method of record-keeping. The third possible way SG & C investment advisers completed the TE form was by partially handwriting the form themselves and then passing the form to Shoemaker, along with any rough drafts or notes gen-

erated on the transaction, for her to add any omitted information to the TE form. In this third situation, Shoemaker would transfer all necessary data from the adviser's rough draft or verbal description to the TE form in her own handwriting. While both advisers utilized Shoemaker to fill out parts of their TE forms, Slocum relied on her most heavily due to his frequent periods out of the office.

Slocum and Gordon both testified that they had an ongoing understanding with Shoemaker that a partially filled out TE form that left client information blank, and that was not accompanied by a separate rough draft list of client information, was always intended for the firm. Shoemaker confirmed this understanding, and added that while she would typically assume an unlabeled trade was for the firm, she would always check with Slocum and Gordon after affirming it to make sure. Douglas testified that it was his policy in a situation where a TE form omitted client information to hold it, and that, if affirming things that day instead of Shoemaker, he would not affirm it until he spoke with Slocum and Gordon to orally confirm with them that it was intended as a firm trade. When presented with such a partially-completed TE form for a firm trade, Shoemaker testified that, after confirming it was a firm trade, she would complete the TE form herself in her own handwriting to indicate that it was a firm trade.

Gordon testified that it was always the goal to get the TE form completed as fast as possible, but, due to the delay in receiving the broker's execution information, the TE forms were rarely completely filled out at one sitting, or even by one person. As a result, multiple handwritings and multiple ink colors often appear on the TE forms. Indeed, Gordon testified to his intermittent use of multiple different pens in a day, at least one of which was a four-

color pen. By the end of the day every day, the investment advisers ·and Shoemaker would usually make sure that all TE forms were properly filled out and placed in a particular file folder maintained by Shoemaker in the operations department, referred to by SG & C employees as the "blue folder" or the "pending transactions folder." [4] Once a TE form entered the blue folder, Shoemaker considered it transferred to the operations department for processing, and she would then write on it herself as needed to facilitate the different procedures necessary to her work in operations. She would also insert other pieces of information on the TE form that were not always available to the investment adviser on the trade day, such as the settlement date, the principal amount, and the commission fees associated with the transaction. These pieces of information were always provided to Shoemaker as a part of her confirmation and affirmation systems in operations.

After a TE form entered the blue folder in operations on a trade day it would remain there until Shoemaker removed the folder toward the end of the day to begin organizing the trades in preparation for the affirmation process the next morning. Once a TE form entered the blue folder, it was never altered by the investment advisers except under very unique circumstances, such as a particular client not having sufficient funds in his or her account to purchase the intended security. In such a situation, the form would be returned to the particular investment adviser for either Slocum or Gordon to realocate the number of shares purchased between the different clients listed.

### E.  *The Operations Department, Affirmation, & Settlement*

The SG & C operations department, although overseen by Douglas, was largely managed by Shoemaker, a longtime employee who did not participate in the profits generated by the firm and, in particular, did not participate at all in the capital gains generated by the firm account. Shoemaker and Douglas were a team that employed essentially the same procedures.

On any given trade day, after an order to purchase or sell was instigated by the investment advisers and the TE form was surrendered to operations, Shoemaker and Douglas would begin their multi-step process of affirmation, confirmation, and settlement. The first step in this process was entering all pending transactions on a white marker board located in the operations department. Shoemaker usually updated the white marker board on a daily basis, and usually retained four weeks worth of trading information on the board, including both buys and sells. For the current week, Shoemaker would include the settlement date for each transaction, which was always three days after the day the trade was placed, and was the date on which payment for the transaction was due. The purpose of the white board was for everyone in the firm to see the pending transactions, and for Shoemaker and Douglas to keep appraised of pending settlement dates so that they could insure that the appropriate funds were available to finance the transaction.

---

4. On rare occasions, Slocum or Gordon would forget to place a· TE form in the blue folder before the end of a trade day. This would cause Shoemaker to have to "track down" the form the following morning to affirm the trade. Such a process happened more frequently with Slocum than with Gordon, as Slocum was less detail-oriented. When this occurred, Slocum always gave Shoemaker the transaction information without hesitation, and never attempted to ascertain the stock's performance or change the form in any way before releasing it to operations.

The second step in the process was affirmation, which typically occurred the morning after a trade was made (T + 1). Affirmation was a process by which Shoemaker would go on-line with SG & C's custodial account at IBT (formerly BankBoston), and review all the information listed regarding trades placed the day before. Shoemaker would then cross-reference this information against the TE forms in her blue folder. For each trade where everything on the computer screen matched the TE form, Shoemaker would electronically affirm the trade. By affirming a trade, Shoemaker was notifying the bank custodian that the transaction was correct, and instructing them to begin arrangements to either receive a transfer of funds to pay for the trade or to prepare to sell their security holdings and receive payment therefor. Shoemaker would not affirm the trade if she did not have the TE form in front of her, and would not affirm the trade if the information on her TE form was inconsistent with what appeared on the affirmation screen.

The third step in the process was confirmation. Once she affirmed the trade, Shoemaker would often print the visible screen to generate a temporary paper confirmation that the trade had gone through. She would then attach this document to the TE form, indicating that the trade was affirmed, and that she was awaiting a paper confirmation from the broker. After a broker called to provide the execution price and confirm the trade, he or she would also mail a paper version of the confirmation to SG & C. Shoemaker testified that this was usually received in the mail prior to settlement day, and that when she received it she would replace the print-out affirmation copy attached to the TE form with the hard copy confirmation from the broker. Shoemaker would staple these papers together and return them to the blue folder to await settlement day.

The fourth step in the process was settlement, which occurred on the third day after a trade (T + 3). Settlement was the process by which SG & C directed payment for a pending security transaction, and it involved dealing with the various bank accounts SG & C maintained for these purposes. In anticipation of settlement day, on the second day after the trade (T + 2), Shoemaker would check the balance on the firm's line of credit at Sovereign Bank to verify the available funds to pay for any firm trade executed two days prior. In addition to preparing for payment of firm trades, the operations department would prepare the necessary sales sheet to debit each client's individual money market account at Merrill Lynch in order to pay for their trades. On occasion, wiring instructions for payment of the securities were faxed to the bank that afternoon.

By noon on the third day following the trade, or settlement date, the following occurred: for the purchase of a security, funds were transferred into the firm's clearing account at Fleet Bank from SG & C's line of credit (for firm purchases) or from clients' individual money market accounts (for client purchases). The funds from both sources remained briefly in the Fleet clearing account and were then transferred into the custodial account at IBT. Once within the custodial account, the funds were distributed by the custodian through the Depository Trust Company to the broker through which the securities were purchased. For a sale, the procedures were reversed. *See* Exhibit P.

Following the completion of a transaction, Douglas generally, or Shoemaker, entered the information on SG & C's computer system, posting the trades to the appropriate accounts. This was referred to within the firm as "keypunching." On

a daily basis, Douglas and Shoemaker received reports from Merrill Lynch as to the balances in the clients' individually segregated accounts at that firm. On a monthly basis, Shoemaker and Douglas sent information to the custodian, which held the securities in electronic form, to reconcile the custodial account and the SG & C account.

## F. Bank Accounts and Cash Flow at SG & C

SG & C kept all clients' records, as well as its own investment records, in individually segregated accounts on its trust department-style, internal computer system. To further accomplish the segregation of client assets from its operating accounts, SG & C created a separate nominee partnership on the advice of counsel in 1979. This fictional entity, Wanton & Co., was a registered nominee with the American Society of Corporate Secretaries. Although a separate entity with a separate tax identification number, Wanton & Co. existed only on paper, and was entirely controlled by SG & C.

Between 1996 and 2000, SG & C maintained a series of bank accounts for different purposes. Client funds were kept in individual, segregated money market accounts at Merrill Lynch. These accounts were held under the name of Wanton & Co. rather than SG & C. SG & C operating funds were kept in their own, separate checking account, and were held under the firm's name. In addition, SG & C maintained an $800,000 line of credit for the firm through Sovereign Bank. This line of credit was used to finance firm trades, and then immediately paid off following each transaction. SG & C also maintained a single clearing account at Fleet Bank and a single custodial account at IBT (formerly BankBoston). These unique accounts warrant further description.

### 1. The Fleet Clearing Account

The Fleet clearing account was a single bank account maintained by SG & C for the purpose of moving funds to their custodial account at IBT to facilitate a stock purchase, or for receiving funds back from IBT after a security sale was effected. Thus, the Fleet account served as an intermediary holding pen for funds as they left the segregated client accounts at Merrill Lynch and the firm's line of credit at Sovereign on their way to be converted into securities by the custodian. Assets were only present in the Fleet clearing account for a short period of time. Indeed, Slocum and Gordon testified that funds were simply routed through this bank account en route to the custodian. However, both client funds and firm funds from the line of credit were routed through the same bank account. *See* Exhibit P.

Although SG & C maintained records of which funds in the clearing account belonged to clients, and which belonged to the firm, these funds were not segregated by Fleet in any manner. When SG & C sold a security, the funds from the purchase were also routed through the Fleet clearing account en route back to either the firm or the client accounts at Merrill Lynch. Again, these assets were not segregated in the Fleet account, and it was up to Shoemaker and Douglas to insure that the funds were wired correctly to their respective post-trade locations. Shoemaker testified that after a firm security was sold and the funds were routed to the Fleet account, some of the money in the Fleet account would be used to repay the firm's line of credit, and any additional profits from a firm trade would ultimately be deposited in the firm's operations account. She also testified that after a client trade, any client funds in the Fleet account

would be wired to Merrill Lynch, where they were then deposited in the appropriate client account. Only Shoemaker, Douglas, and the operations department at SG & C retained records of who owned these clearing account funds and how they should be distributed.

## 2. *The IBT Custodial Account*

Prior to 1988, SG & C kept the securities for its clients in a bank vault in Newport. After the SEC examined SG & C's system in 1988 and recommended changes to their method of holding securities, SG & C opened and maintained the IBT custodial account for its clients' securities. According to Gordon, the concept of the custodial account was based on SG & C's interpretation of the Gardner and Preston Moss SEC No Action Letter issued in 1982. *See* Exhibit AA. In a letter Gordon wrote the SEC in 1988, explaining the new system, Gordon makes reference to SG & C's reliance on the Gardner and Preston Moss No Action Letter.[5] *See* Exhibit 39.

The single custodial account was established under the name of Wanton & Co., and was intended by SG & C to serve as an electronic vault for securities. However, the IBT custodial account, as it existed, was more akin to a bank account than an electronic vault. When SG & C would initiate a stock purchase, the funds for that purchase, whether for the firm or for clients, would both enter this account from the clearing account at Fleet and coexist together in the IBT account for a short period of time until they could be gathered by the custodian and utilized to pay for the securities ordered. Once these funds were used to purchase the securities, the IBT account would then hold the securities, without distinguishing between firm and

client ownership, until SG & C made a decision to sell them. When a decision to sell was made, IBT would sell the securities indicated, and then, for a short period, would hold the funds before routing them back to SG & C through the clearing account at Fleet.

While the IBT custodial account held securities, and also for the short periods of time that it held funds before transferring them to the clearing account, these assets were not segregated in any way within the bank itself, but rather all registered under the name of Wanton & Co. The only record of which entity owned what particular security, or to what party the funds were payable, whether clients or the firm, was maintained by SG & C alone in their internal records. SG & C submitted monthly reports to IBT explaining their calculation of which securities belonged to clients and which belonged to the firm, and these monthly reports were the only method the bank had of assigning ownership to the different securities. No records were submitted regarding the funds, as they were only in the account for a short period of time. However, although the monthly report on security ownership was submitted to IBT, no internal, bank-based segregation of the client securities and the firm securities was performed, or even attempted. The custodial account was maintained as one, single account containing both firm and client assets, registered under the name of Wanton & Co.

## G. *Compliance Initiatives at SG & C*

SG & C employed several different procedures in an effort to maintain SEC compliance. When first establishing their investment firm in 1978 and 1979, Slocum and Gordon sought the advice of counsel,

---

5. Although Gordon's letter to the SEC describes the new custodial process in detail, it neglects to mention that the same custodial account developed for client funds and securities will also contain firm funds and securities. *See* Exhibit 39.

and formulated their account structure in accordance with their attorney's recommendations. SG & C also relied on the advice of counsel in reformulating their account structure to include the use of a separate custodial account in 1988. *See* Exhibit 39.

In addition, SG & C filed an annual compliance report with the Commission, known as an ADV Form, which outlined SG & C's trading practices and account structure. *See* Exhibits 32, 33, and 34. The ADV Form was prepared by Gordon, and he also bore the responsibility for updating it on an annual basis. Attached to this report was a firm brochure, which Gordon described as a user-friendly version of the information provided on the ADV form that SG & C prepared for new clients. This client brochure was submitted to the SEC annually along with the ADV Form. The annual filing of an updated ADV Form, along with the attached firm brochure, represented the firm's method of communicating with the SEC and disclosing the firm's practices. Both the ADV Form and the firm brochure indicated that SG & C bought and sold securities for itself that it also recommended to clients. In addition, the ADV Form included the following language describing SG & C's firm trading policies:

> [The] firm or its partners may take short-term trading positions for their own accounts and securities which for reasons of market risk or holding period expectations the firm may deem inappropriate for clients' accounts. However, in any case where either the firm or its partners make purchases or sales of securities whose objectives coincide with the fundamental investment philosophy of the firm, those transactions will always be in conformity with other similar transactions for clients.

Exhibit 32, Schedule F. SG & C filed this paperwork with the Commission regularly through the relevant time period.

Other regular controls SG & C had in place were annual surprise examinations by their independent auditor, Deloitte & Touche. Deloitte & Touche had a long standing relationship with SG & C. Each year, in accordance with the requirements of Rules 206(4)–2 and 204–2(b) of the Advisers Act, Deloitte & Touche performed a confirmation of securities held by the custodian, IBT, and the client accounts at Merrill Lynch, and also examined those aspects of the SG & C's books and records as were "considered necessary in the circumstances." *See* Exhibit Y27. Deloitte and Touche did not, however, conduct a comprehensive audit of SG & C's records, and did not examine any assets in the Fleet clearing account.

After each annual examination, Deloitte & Touche issued a letter to SG & C explaining the parameters of their examination and opining that "no matters came to [their] attention that caused [them] to believe that the investment accounts should be adjusted or that [SG & C] was not in compliance...." *See* Exhibits Y25–Y32. Although Deloitte & Touche always clearly explained in its letters that their surprise examination did not constitute an audit made in accordance with generally accepted auditing standards, and included language in each letter specifying that it "[did] not express an opinion on the investment accounts [at issue]," Gordon testified that he considered a positive letter from Deloitte & Touche to indicate that SG & C procedures were appropriate and that SG & C was in compliance with the SEC. During the relevant time period, Deloitte & Touche examined SG & C's accounts annually, and each time SG & C received a letter from Deloitte & Touche indicating that no potential compliance issues were

uncovered in the course of its confirmation procedures.

Another essential aspect of SG & C's compliance initiatives were the sporadic examinations of its accounts and procedures by the SEC itself. The SEC descended on SG & C and examined its books and record-keeping procedures periodically over its years of operation. Prior to the relevant time period, the Commission's two most recent examinations occurred in 1988, which spurred SG & C to create its custodial account, and in 1994, which resulted in alterations to SG & C's ADV Form, imposition of monthly updates to the firm's general and auxiliary ledgers, and inclusion of additional information on the firm's TE forms.

Whenever SG & C effected a substantial change in any of its accounting procedures in response to SEC examinations, Gordon would write a letter to the SEC explaining the firm's changes and its efforts toward achieving compliance. One such example is Exhibit 39, Gordon's letter to the SEC explaining the firm's decision to establish the custodial arrangement with IBT. Gordon testified that although he wrote and sent this letter to the SEC explaining the custodial account, he never received a response from the Commission. He also testified that although he relied on the Gardner and Preston Moss "No Action Letter" in creating the SG & C custodial relationship, he never sought a separate "No Action Letter" from the SEC for SG & C. When the Commission examined SG & C's records and procedures in 1994, and deficiencies were identified by the Commission, Gordon also generated a letter describing the firm's steps towards compliance. *See* Exhibit W–5. The 1994 examination by the SEC resulted in no negative commentary regarding the SG & C's account structure, so SG & C assumed that it

was in compliance with the applicable rules and regulations.

After the 1994 examination, SG & C's next visit from the Commission occurred in March of 2000, which gave rise to the investigation generating the allegations at issue in this case.

### PART TWO: CHERRY PICKING ALLEGATIONS

#### A. *The SEC Examination in 2000*

In March of 2000, the SEC returned for a surprise examination of SG & C. As in past SEC examinations, Gordon instructed Shoemaker and Douglas to make all firm records available to the SEC auditors, and to allow them access to any information they needed. However, this time, as Commission representatives began to examine SG & C, it became clear that the Commission was unhappy with several of SG & C's operating practices.

First and foremost among these questionable practices was SG & C's cash flow and bank account structure, which allowed funds coming to and from the firm's line of credit and client funds to coexist in the same clearing and custodial accounts. When coupled with both SG & C's high rate of success on short-term firm trades and the firm's practice of only partially completing TE forms at any one sitting, the SEC became concerned that the SG & C investment advisers were engaged in a process known as cherry picking.

Cherry picking, as defined at trial, is a practice by which an investment adviser purchases a security, waits to evaluate its performance, and then allocates it to himself or his firm rather than clients if it "pops," or goes up quickly within a short period of time. To explain this another way, an investment adviser engaging in cherry picking buys securities in blocks without determining an intended recipient.

Then, between trade day and settlement day, he watches the security's performance. If the value increases significantly, he allocates the security to the firm, thus picking the "cherry" for himself. However, if the value decreases prior to settlement, or if it stays the same, the investment adviser allocates the security to his clients, thus leaving them the "pit." During its examination, the SEC became suspicious of SG & C's operations practices because, due to the commingling of funds and SG & C's inconsistent procedure for preparing TE forms, the window of opportunity for such activity was present. As a result of these findings, the Commission instigated a formal investigation of SG & C and its operational practices during the spring and summer of 2000. This investigation ultimately resulted in this cause of action.

## B. The Commission's Evidence

At trial, the only first-hand evidence of a cherry picking scheme offered by the Commission was the testimony of SG & C's former partner, Jane Lippincott, who left the firm in January of 2000 to start her own business. All the Commission's other evidence of cherry picking was circumstantial evidence based on trading patterns it considered suspicious. At trial, Lippincott, who was not a defendant, testified under subpoena, and received immunity from the Commission in exchange for her testimony against her former partners and firm.

## 1. Lippincott's Firm Involvement

Lippincott originally started working at SG & C as a summer intern while she was a college student at the University of Rhode Island. After her graduation in 1981, she began working full-time, and became a partner in 1991. Although a partner and a portfolio manager, Lippincott did not manage more than 10% of SG & C's client accounts, and did not engage in firm trading. According to Lippincott, this constituted around 20 client accounts, however, she admitted that several of these accounts were her family members or her own personal accounts. Throughout her tenure at SG & C, Lippincott considered Slocum her mentor and friend, and she testified that the vast majority of her client accounts were given to her by Slocum, and that Slocum assisted her with her trading decisions for these accounts. In fact, she testified Slocum was so involved in her purchase and sale decisions that it was rare for her to ever complete and sign a TE form entirely on her own over all the years she served as a partner.

In the mid–1990s Lippincott had her first child, and reformed her work schedule so that she was only in the office three days a week, and the other days she worked from home. During the last years of her association with SG & C, Lippincott became very involved in competitive tennis, and was often out of the office engaging in tennis-related activities or other business opportunities not associated with SG & C. This gradual distancing from the firm continued until the fall of 1999, when Lippincott approached Slocum and Gordon about increasing her partnership share. At the time, she confided in Slocum that she was considering leaving the firm if her share was not substantially increased. Shortly thereafter, Lippincott was present at a meeting where Gordon outlined how the partnership shares were distributed, and informed all SG & C partners that in order to increase their share of the firm's profits they needed to either take on additional client accounts or increase their participation in the firm trading account. Lippincott testified that after this meeting she deduced that she was not going to be able to achieve the percentage share she was interested in without substantially in-

creasing her work load, so she decided to leave the firm. Lippincott tendered her resignation letter to Slocum on January 2, 2000.

During the SEC's investigative hearings, Lippincott testified that Slocum and Gordon were engaged in a general practice of cherry picking profitable securities for the firm's account, and specifically mentioned Halliburton as a security that SG & C cherry picked during the relevant time period. However, at trial, the evidence showed that Lippincott was entirely mistaken about the Halliburton trades, because these trades were initiated in every instance for clients rather than for the firm. When confronted with this disparity, Lippincott admitted that she was mistaken about these trades, since no portion of the profits went to the firm account. The only other possible example of cherry picking Lippincott mustered was the American Home Products transaction, which the Court will now discuss.

### 1. *American Home Products*

In addition to her Halliburton assertions, Lippincott claimed to have personally witnessed one instance of cherry picking at SG & C regarding a trade of American Home Products stock on Wednesday, August 18, 1999. The circumstances surrounding this transaction were as follows. The morning of August 18, Lippincott and Slocum discussed purchasing 3,000 shares of American Home Products ("AHP"). Lippincott testified that she believed this purchase was for clients, however she could not remember which clients, and never made a list or any form of rough draft or notes regarding which clients she or Slocum intended it for. Lippincott also failed to recall the reason why the purchase was initiated. Slocum testified that it was intended as a firm trade, and was event-driven. Specifically, Slocum testified that he wanted to make a firm trade in AHP on August 18 because he had heard rumors of a potential merger between AHP and Glaxo–Wellcome, another major pharmaceutical company, which he hoped would cause the stock to increase rapidly over a short period of time.

After the decision to purchase was made, Slocum had Lippincott call a particular broker at the firm Hambrecht & Quist to place the trade. SG & C had previously had a relationship with Hambrecht & Quist, but had not utilized the firm for trading for over a year and a half. Slocum testified that he had Lippincott initiate the trade with Hambrect & Quist because a particular broker she had dealt with favorably in the past, Richard Vesse, had recently transferred within that firm from its San Francisco office to the Boston office, and he thought that this trade would be an opportunity for Lippincott to utilize her friendship with Vesse to reestablish SG & C's relationship with the brokerage firm. Slocum also testified that Lippincott had been utilizing research services offered by Hambrecht & Quist during that time period, and that he wanted to "increase her stature" with the broker by demonstrating that she was in a position to pay for the research with commission fees. Lippincott confirmed that she called Hambrecht & Quist to initiate the trade because of her past association with Vesse. After Lippincott placed the trade and filled out some portions of the TE form for it, including the date, the security transaction, the broker, the representative, the execution price, and the settlement date, *see* Exhibit MM–12, she immediately left the office for the remainder of the week to play in a tennis tournament.

Lippincott did not return from her tennis tournament until Monday, August 23, 1999. At that point, Lippincott testified that she became aware that Slocum and

Shoemaker had processed the AHP transaction as a firm trade, and Slocum was in the process of selling it for a profit. Lippincott testified that she had a conversation with Slocum where he indicated to her that the AHP stock had "popped" so he had "run it through the firm account." [6] Slocum denies having such a conversation with Lippincott, and also denies ever using the term "pop" in relation to a security. Shoemaker confirms that Slocum and Gordon were not in the habit of describing stocks that went up quickly as having, "popped," and testified that the only person she ever heard use this term to describe securities was Lippincott. Shoemaker also testified that she never altered the paperwork mid-stream to change a trade's allocation from particular clients to the firm account.

Lippincott testified that she was annoyed that the trade was not allocated for clients, but admitted that she took no steps to notify others in the firm, such as Shoemaker, Douglas, or Gordon, that the trade was supposed to be for clients. She also testified that she made no attempt to correct the error herself. Lippincott also failed to remember which clients she intended the transaction for, and never made or submitted a list of these clients to Slocum or Shoemaker before leaving the office for her tennis tournament the week before. Taking all of this into consideration, the Court is not persuaded that the AHP was reallocated from client accounts to the firm. The fact that Lippincott left the AHP TE form without a client list, especially in light of Slocum and Shoemaker's stated policy to regard blank TE forms as firm trades, indicates that this trade was, at most, an error made in favor of the firm, and not an example of cherry picking.

Slocum testified that he believed the TE form represented a firm trade, and that no client list was ever brought to his attention regarding it at any point in time. The testimony indicated that if Lippincott had approached her partners and indicated that the AHP trade was erroneously marked up as a firm trade, SG & C would have had the opportunity to correct the error, both on the transaction TE form and through their accounts. However, Lippincott never notified any of her co-workers that she intended this as a client trade, but had forgotten to attach a client list before leaving to play tennis. This example does not constitute cherry picking.

### 2. *Lippincott's Conversations*

Lippincott also testified to several conversations she had with Slocum and Gordon after leaving the firm that she interpreted negatively. The first is a conversation with Slocum where the two were discussing Lippincott's difficulties in starting her own investment business. Lippincott's new investment firm had no client base, and, as a result, generated no commission fees from clients. When talking with Slocum about this business, she testified that Slocum commented that she "didn't have clients to fall back on." Lippincott interpreted this comment as meaning that she didn't have client accounts and thus could not cherry pick and pass the "pits" on to her clients. Slocum testified that what he meant by this statement was that Lippincott could not fall back on her commission fees from clients when the mar-

---

6. Lippincott also testified that she heard similar terminology used at partners meetings to describe Slocum and Gordon's decision to reallocate favorable securities to the firm that were originally intended for their clients. No other witnesses corroborate this testimony, and both Slocum and Gordon deny it.

ket was in a down-swing. The second is a comment that Slocum made to her regarding the SEC investigation in 2000, where he joked that SG & C "should have booked a loss." Lippincott also interpreted this comment as an admission that cherry picking had been occurring at SG & C.

At her SEC hearing, Lippincott testified that her beliefs about the Halliburton transactions influenced her interpretation of both of these comments. Although impeached with this prior testimony at trial, Lippincott refused to admit that she could have been mistaken about Slocum's meaning in either context. In light of her misunderstanding, however, the Court is compelled to discount her interpretation.

Finally, Lippincott testified about a telephone conversation she had with Gordon during the SEC investigation, where she testified that Gordon told her that he wanted to make sure Lippincott was "on the same page" as he and Slocum were regarding her recollection of events. Lippincott's handwritten notes of this conversation were introduced into evidence at trial, and they included the statements "trading account issues were known before the trade and not after the trade" and that the "firm never had a trading account, just borrowed money, dollars." *See* Exhibit 43. Lippincott testified that, in her opinion, neither of these statements from her notes were accurate descriptions of practices at SG & C. Gordon denied ever telling Lippincott that SG & C never had a trading account, and testified that his telephone conversation with Lippincott was merely intended to bring her up to speed on the SEC investigation since she had been a firm partner during the relevant time period. Although Gordon's conversation with Lippincott during the Commission's investigation suggests that he was aware that SG & C's practices were under fire, and

that some of the firm's operations were questionable in the eyes of the Commission, it is not enough to establish that cherry picking had occurred.

### 4. *Family Trades & Howard Trades*

In addition to the Lippincott testimony, the SEC's other trade-specific evidence focuses on their analysis of 22 short-term trades SG & C made for clients during the relevant period. The Commission argues that these trades constitute examples of SG & C cherry picking favorable trades for preferred clients.

Each of these transactions was initiated by Slocum, who testified that although he generally preferred long-term investments for clients, he would occasionally engage in short-term trades for a small percentage of his client accounts where the particular individual had indicated that he or she was not averse to this level of risk. Incidentally, all the clients willing to consider short-term trading were individuals close to the firm and its partners: Slocum's family members, a former partner, John Howard, and Howard's wife. These trades can be considered in three groups.

### a. *The Reallocated December 1999 Trades*

At the end of December, 1999, Slocum engaged in two security transactions originally initiated for the firm, but which were reallocated to his mother and sister after a profit was realized on the transaction. These two trades were a purchase of Scient, initiated on December 27, and sold on December 30, and of Bank of America, initiated on December 28 and sold on December 30. Exhibits NN–711 and NN–105. In both cases, Slocum testified that he originally initiated the trade for the firm, and intended it to be financed through the firm's line of credit at Sovereign Bank. However, when placing these

short-term trades, Slocum had forgotten that as a condition of SG & C's arrangement with Sovereign for the line of credit, the line of credit had to be reduced to zero once a year. It was the operations department's practice to "zero out" the line of credit annually on December 31. The two firm trades violated this policy because the settlement date for the sale would occur after the traditional "zero out" day had passed. Because it was the end of the year, no new "zero out" day could be arranged, and the trades had to be reallocated.

Shoemaker was the first to recognize that these two trades violated the firm's agreement with Sovereign, and brought them to Slocum's attention on the last business day of the year in 1999, after the sale was already initiated. Slocum testified that he needed to act quickly, so he selected clients who he knew had enough funds in their Merrill Lynch accounts to finance the trades and would not mind his decision to engage in a short-term, risky trade for their benefit. These clients were his mother and his sister. He then altered the two TE forms to reflect the change by crossing out the firm's name and account information, and replacing it with the account information for his two family members.

Shoemaker testified that she remembered this incident, and that it was "unique" in her experience at SG & C. Slocum's error and subsequent reallocation was clearly documented on the two TE forms. *See* Exhibits NN–711 and NN–105. These trades were an attempt by Slocum to correct an error, and not an example of cherry picking.

b. *Slocum's Family Investments*

Slocum testified that he made certain investments for members of his immediate family that were short-term in nature, consistent with the established risk level appropriate for these accounts. He also engaged in the purchase of long-term holdings for these accounts. Slocum testified that sometimes trades that he initially instigated for clients as long-term holdings would be sold prematurely if they achieved his desired rate of return sooner than he had expected. He and Gordon characterized these as "short-term holdings" rather than "short-term trades." In several instances, Slocum's mother, sister, and son, as well as other clients, benefitted from these short-term holdings. Slocum's family members also participated in client trades that resulted in a loss. *See* Response to Appendix A, Edison, Octel, Viant. While Slocum's investment strategy for his family members might have been more aggressive than that which he employed for other clients, these transactions do not constitute cherry picking.

One particular family trade stands out due to a reallocation of share proportions after the trade was initiated. On December 20, 1999, Slocum's mother and sister, along with other clients, participated in a purchase of Solectron. Due to insufficient funds in other client accounts, Slocum had to redistribute the number of shares among the clients listed on the TE form, giving his mother and sister a larger share of the purchase than he had originally intended. Exhibit NN–748. Again, Slocum testified that he chose his mother and sister for these purchases because he knew that they had sufficient funds in their Merrill Lynch accounts to accommodate the transaction.[7] Shortly thereafter, because

7. Slocum testified that the funds necessary to finance this transaction were $55,000 from his mother's account for 650 shares of Solec-

tron, and $51,510 from his sister's account for 600 shares of Solectron.

he was uncomfortable with them owning such a large position in Solectron, he reduced their holdings significantly.[8] This amounted to a short-term trade for his mother and sister on a portion of their Solectron holdings. Slocum's mother and sister, along with the other clients from the original December 20 TE form, continued to hold the remainder of their Solectron positions until April 4, 2000, when the price had dropped considerably.[9]

The Solectron trade is another example of Slocum utilizing his mother and sister's accounts to assist him in correcting erroneous trade allocations among clients. They do not, however, constitute cherry picking.

#### c. *The Howard Trades*

Slocum made several short-term trades for John Howard ("Howard"), a retired partner of SG & C who was a sophisticated investor prior to his retirement in 1992, and who was willing to take risks in his investments. Often the securities Slocum purchased for Howard and his wife were handpicked by the retired partner as long-term investments and purchased by Slocum against his own better judgment. According to Slocum, during the relevant time period, Howard would often drop by the office to visit Slocum and request that Slocum purchase particular securities for his account. Slocum testified that more often than not, the trades Howard wanted were very risky, and that Slocum would attempt to talk his retired partner out of the transaction, but that such an attempt was usually unsuccessful. In such a situation, Slocum would purchase the security

for Howard as he requested, but he would typically try to sell it as fast as possible to avoid the possibility of a loss. Indeed, Slocum testified that during the time period at issue, he began to have serious doubts about Howard's business judgment and even spoke to his wife regarding his concerns.

The Howard trades, while an example of short-term holdings, do not constitute cherry picking. No evidence has been presented that Slocum purchased these risky securities without an intended recipient and then allocated them to Howard because they generated a profit.

#### 3. *Shoemaker & Douglas*

If a cherry picking scheme had existed at SG & C, both Shoemaker and Douglas, the individuals dealing with all the paperwork necessary to facilitate a transaction at the firm, would have been aware of it. Not only would Shoemaker and Douglas have to have known about such a scheme, but they would have been forced to actively participate in the scheme by holding the TE forms until either Slocum or Gordon made an allocation decision, or altering TE forms as the allocation from clients to the firm shifted with market conditions. However, both Shoemaker and Douglas testified that the TE forms were always completed by either the end of the day a trade was initiated, or the following morning, and that once TE forms were completed, they were generally never altered, except in unique situations. According to Shoemaker, TE forms within her blue folder were only altered to correct errors, such as in a situation where a particular client

---

**8.** On December 22, 1999, Slocum sold 500 shares of both his mother and sister's holdings of Solectron, reducing their holdings to 150 and 100 shares, respectively. Both profited from the short-term transaction.

**9.** When Slocum sold a portion of his mother and sister's shares of Solectron on December 22, the price was $89 per share. When he sold the remainder of the Solectron position on April 4, the price had dropped to $42 per share.

had insufficient funds to effectuate a purchase, or where Slocum's firm trade created a balance due on the line of credit over the year's end. Both Shoemaker and Douglas testified that they were unaware of a cherry picking scheme at SG & C, and the Court concludes that both are credible witnesses.

## C. Cessation of Firm Trading

In the late spring of 2000, after receiving the SEC's deficiency letter, SG & C discontinued its practice of short-term firm trading. Both Slocum and Gordon testified that there were two reasons for their decision to stop firm trading at SG & C. First, as Slocum and Gordon correctly predicted earlier in their regular firm newsletter, *A View From Mill Street*, the historic bull market that existed during the 1990s was ending. *See* Exhibits Z1, Q, & R. This market change resulted in a less desirable environment for short-term, momentum trading. Second, with the SEC's investigation underway, and questions in place about SG & C's compliance, Slocum and Gordon decided that they needed to discontinue firm trading until the matter was clearly resolved. As a result, SG & C stopped its short-term trading for the firm account in May of 2000, and no longer engages in the firm trades in the manner described above.

## D. Reformulation of Account Structure

During the fall of 2000, after the SEC instigated its investigation and questions were raised about the account structure at SG & C, the firm, on its own initiative, made the decision to re-structure SG & C's account system. In November and December of 2000, all of the client assets managed by SG & C were moved to new accounts at Fidelity Investments. These new accounts are client-specific, individual accounts, and are completely segregated. During this time period SG & C discontinued its use of its client accounts at Merrill Lynch, its clearing account at Fleet, and its custodial account at IBT. All SG & C's cash flow for facilitating security transactions is now managed by Fidelity, and is individually segregated by account. SG & C also opened a separate firm account at Fidelity intended for firm trading, however, because the firm stopped trading for itself in May of 2000, this account has never been utilized.

## E. Lack of Client Losses

In its Complaint, the SEC alleges that SG & C assigned losses to their clients. However, at trial, all the testimony negated such an assertion, and no evidence was produced at trial to support this allegation. Indeed, the SEC failed to introduce evidence of any particular instance where an SG & C client suffered an actual loss due to the firm's operational practices. Instead, the Commission introduced evidence of hypothetical client losses. The SEC's analyst, Vance Anthony, testified and authenticated documentation showing that the closing price of SG & C's client trades on the trade day was lower than the purchase price 47% of the time, and that the closing price on the day after the trade was lower than the purchase price 49% of the time. Anthony's data compilations were introduced into evidence by the Commission. *See* Exhibit 6. Essentially, the SEC posits that this reduction in value demonstrates hypothetical client losses.[10]

The SEC argues that the evidence demonstrates that there was no potential for profit in the three day period following an

---

10. In addition, the SEC contends that an examination of Defendants' Exhibit F reveals that there were "potential losses" of over $5 million on client trades in the three day period after settlement. *See* SEC Post Trial Reply Memorandum at 7.

SG & C client trade approximately 14% of the time, and that there was a potential for loss during this three day period 85% of the time. However, this downward trend in client securities during the days immediately following purchase is consistent with Slocum and Gordon's philosophy of buying client securities during a period of weakness, holding them for an extended period, and then selling them later in a position of strength. The SEC has produced no evidence of actual losses realized by SG & C clients during the relevant time period. Indeed, the evidence demonstrated that many of SG & C's client accounts achieved a 95% return rate between 1996 and 2000. Even Lippincott testified that she believed her personal and family investment accounts were safe at SG & C, and her ultimate decision to move these accounts from SG & C was unrelated to the Commission's investigation or allegations. Without specific evidence, the Court is compelled to find that no actual client losses occurred during the relevant time period.

To counter the Commission's hypothetical loss analysis, Defendants presented equally hypothetical data projecting the potential profits SG & C could have realized between 1996 and 2000 had their operations merely been a "front" for cherry picking. Defendants' analyst, Frederic Miller, prepared a schedule of all trades SG & C instigated during the relevant time period. Miller's compilation suggests that if SG & C had been involved in a cherry picking scheme, they would have had the opportunity to reap an additional $4.2 million in firm profits. *See* Exhibit F. However, they did not.

### III. *Conclusions of Law*

In an effort to expose some manner of fraud on the part of SG & C and its partners, the Commission has asserted eight counts of federal securities violations against the Defendants. As outlined previously, the Commission's list of allegations can be broken into three main areas, each governed by its own set of statutes and regulations. These categories are cherry picking, technical violations, and aiding and abetting. The Court will address each of these areas and the law that governs them.

### A. *Cherry Picking*

The first two counts of the Commission's Complaint relate to its cherry picking allegations against the Defendants. Specifically, the Commission argues that SG & C, Slocum, and Gordon cherry picked profitable securities for their firm that were originally intended for clients, in violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b–5 thereunder. *See* 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. The language of these statutes and the accompanying regulation are as follows:

*The Securities Act:*

(a) **Use of interstate commerce for purpose of fraud or deceit**

It shall be unlawful for any person in the offer or sale of any securities … directly or indirectly–

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which oper-

ates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a) (2000).

*The Exchange Act:*

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (2000).

*Rule 10b-5:*

It shall be unlawful for any person, directly or indirectly, . . .

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (2003).

■ Courts have recognized that the standard of proof is similar for violations of both Section 17(a) and Section 10(b) and Rule 10b-5 promulgated thereunder. *See SEC v. Berger,* 244 F.Supp.2d 180, 188–89 (S.D.N.Y.2001). Generally, a violation of

Section 10(b) and Rule 10b-5 occurs if a defendant has: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *Id.* at 188; *see also Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798, 804 (1st Cir.1987). The standard for a Section 17(a) violation is basically the same, although " 'no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3).' " *Berger,* 244 F.Supp.2d at 188 (quoting *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir.1999)).

■ Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The First Circuit has recognized that scienter may be established by indirect evidence, and "may extend to a form of extreme recklessness[.]" *In re Cabletron Systems, Inc.,* 311 F.3d 11, 38 (1st Cir.2002). In this context, however, "recklessness" must be more than a greater degree of ordinary negligence; it must be extreme, rising to "a lesser form of intent." *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 198–99 (1st Cir.1999). The First Circuit has defined recklessness, in this context, as follows:

Reckless conduct may be defined as [a] highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that it is either known to the defendant or is so obvious that the actor must have been aware of it.

*Id.* at 198 (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977)).

It is also important to define materiality. According to the United States Supreme Court, an omitted fact or misstatement in securities transactions is material if there is a substantial likelihood that a reasonable investor would consider it important in making his or her investment decision as to a particular security. *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *see also SEC v. Fife,* 311 F.3d 1, 9 (1st Cir.2002).

■ Having recited the standard, the Court turns to the Commission's case. In order to prove a violation of Section 17(a)(1), Section 10(b), and Rule 10b–5, the Commission must show that Defendants, knowingly or recklessly, engaged in material misrepresentations, material omissions, or fraud in the sale of securities. In order to prove a violation of Section 17(a)(2) and (a)(3), the Commission must prove that SG & C engaged in the same course of conduct, but there is no required showing of scienter. The SEC argues that Defendants violated these statutes and regulations by engaging in cherry picking. However, as the court will now discuss, the SEC has failed to meet its burden of proof in this respect.

### 1. *The Commission Produced No Direct Evidence of Cherry Picking*

The SEC adduced evidence during the trial that Defendants' method of operations provided Slocum and Gordon with the opportunity to cherry pick profitable client securities for the firm. The firm's bank account structure, its handwritten TE forms, and the manual controls present in the operations department created an environment where fraud could have occurred. However, mere opportunity for possible fraud does not translate into actual wrongdoing. The Commission bears the burden of proof, and must demonstrate that Defendants actually engaged in securities violations with specific evidence.

From the outset, the SEC has admitted that its only direct evidence of cherry picking rests entirely on Lippincott's testimony regarding the AHP transaction and the Commission's analysis of Slocum's reallocated family trades and short-term holdings for certain clients, including former SG & C partner, John Howard, and his wife. However, as the Court previously noted, that evidence did not prove that cherry picking occurred. Thus, as the Commission failed to demonstrate cherry picking at SG & C through direct evidence, the Court turns to the circumstantial evidence presented.

### 2. *The Commission's Circumstantial Case Fails*

At the end of the trial, the Court instructed the Commission, who bears the burden of proof in this case, that it had to demonstrate to the Court that cherry picking occurred at SG & C through specific examples. As this writer stated at the time, the Court is unwilling to go through the record with a fine tooth comb in an attempt to prove the Commission's case.

However, specific examples of cherry picking are not prevalent in the Commission's analysis of the evidence. Rather, the Commission suggests that this Court should consider every firm trade made between 1996 and 2000 "tainted," and scrutinize each transaction methodically to identify certain "suspicious" patterns in SG & C's trading that the SEC argues are indicative of fraud. To facilitate such an analysis, the Commission provided the Court with a detailed Appendix to its post-trial memorandum, describing every firm transaction made during the relevant period and forcing each to fit into its theory that SG & C and its partners were en-

gaged in wholesale fraud on their clients and the Commission.

The Commission argued, both at trial and in its post-trial submissions, that while they had minimal direct evidence of cherry picking, a thorough analysis of SG & C's trades over the relevant period revealed certain trends in firm security purchases supporting an inference of cherry picking by the Defendants. In so doing, the Commission focused on trends, or "patterns" in Slocum and Gordon's firm trading that they argue, when taken together, establish an inference of cherry picking by the Defendants. The Court will now discuss the patterns Plaintiff has identified.

a. *Overlap of Firm and Client Securities*

The Commission argues that the Defendants' practice of purchasing a security for the firm and then later purchasing the same security for clients is evidence of cherry picking. The Commission points to 54 occasions where Slocum and Gordon made purchases of the same security for clients shortly after having made a purchase for the firm. *See* Plaintiff's Post Trial Memorandum at 12, n. 7. In approximately 29 of these 54 incidents, the number of shares SG & C chose to purchase for their clients was identical to the number purchased for the firm. *Id.* at 7–8, n. 8. In many cases, the cost-basis of the security was higher when SG & C purchased it for their clients than when the firm purchase was initiated. *Id.* at 8. The Commission argues that this pattern indicates that SG & C had a practice of reallocating securities purchased for clients to the firm account if they went up in value over the three day period between the trade day and settlement and then subsequently repurchasing the same securities for their clients later to replace the cherry picked ones.

Defendants counter this argument by pointing out that both Slocum and Gordon testified that they generally traded in one "universe" of particular securities that they followed on a regular basis, and that both firm and client trades came from this same group of securities. In light of this unrebutted testimony, one would expect the securities SG & C chose for firm and client transactions to overlap to some degree. In addition, Slocum specifically testified that it was his practice in many cases to purchase a security for the firm to "test the water" before initiating a client purchase. This testimony is also unrebutted. Finally, both Slocum and Gordon testified that they generally purchased securities for both clients and the firm in round lots to minimize commission fees. Thus, the majority of the stock purchases initiated during the relevant period were transactions to purchase a "position" in a security, or several thousand shares. According to the investors, this accounts for the similarity in the amounts purchased.

Most persuasive, however, was Slocum and Gordon's testimony regarding specific transactions. In most cases, Slocum and Gordon were able to testify to specific events that triggered their firm purchases, and then explain why, after the events causing the sudden increase in price abated, they later considered the investment stable and appropriate for clients. Each transaction Slocum and Gordon testified about conformed with their stated strategies for both firm and client trading, and the SEC produced no evidence challenging this testimony.

b. *Short-term performance of Client Securities and Defendants' Success Rate*

The Commission also argues that a comparison of the performance of stocks purchased for the firm's trading account with stocks purchased for clients demonstrates

that SG & C was engaged in cherry picking. This argument revolves around Defendants' success rate for firm trades during the relevant period. Between 1996 and 2000, SG & C realized a profit on securities purchased for its firm account 98% of the time. Exhibit 2. This profit was always realized within the first three days after Slocum or Gordon initiated a firm trade, prior to settlement. Thus, taking Defendants' success rate into consideration, one can infer that the securities SG & C purchased for the firm increased in value over the three day period between trade day and the settlement date 98% of the time. However, according to the Commission's analysis of client trades, the securities that SG & C purchased for their clients decreased in value on the day after the trade day approximately 47% of the time, and as of the close of trading two days after the trade date, they decreased in value approximately 49% of the time. Exhibit 6. The Commission argues that this disparity is evidence that SG & C investment advisers were allocating the profitable trades, or "cherries" to the firm and leaving less profitable transaction, or "pits" for their clients. The Commission also suggests that SG & C's success rate on firm trades was impossible to achieve under normal market conditions, and that, therefore, the Court should conclude that it is the product of cherry picking and fraud.

However, the SEC's theory fails to take two factors into consideration. First, Slocum and Gordon both testified that they employed different strategies when trading for clients than when trading for the firm's account. Their testimony was that they would generally try to buy securities for their clients at a time of weakness, and hope to sell these securities in a position of strength after an extended holding period. Indeed, the testimony indicated that Slocum and Gordon would look for stocks that they believed were in a downward trend for their clients, hoping to purchase a larger position in the security for them at the lowest possible price, and then hold the security until it regained momentum and achieved the desired rate of return. Lippincott also testified that SG & C's client trades that she was involved with during this time period were generally long-term holdings bought on weakness and sold on strength. For firm trades, however, Slocum and Gordon testified that they looked for securities that they hoped would suddenly increase in value due to market events. The Commission's statistics, which show client securities going down in the short-term and firm securities going up, demonstrate this trading strategy in operation.

Second, in arguing that SG & C's success rate was not achievable legitimately, the Commission fails to recognize how successful the SG & C investment advisers were for their clients during the relevant period. Between 1996 and 2000, during a historically well-performing bull market, Slocum and Gordon's client accounts performed extremely well, many achieving a 95% rate of return. The Commission produced no independent evidence of individual client losses, and no SG & C clients testified against the firm. The Defendants were sophisticated, experienced securities investors who were extremely successful in all of their accounts over the relevant time period. Given the unusual market conditions existing at the close of the decade, the Court is not persuaded that Defendants' firm trading success rate was impossible to achieve legitimately.

c. *Limit Orders*

The Commission's last trend-based argument concerns SG & C's use of limit orders for firm transactions. During his testimony, Gordon stated that he typically

used limit orders for client purchases and market orders for firm purchases.[11] However, as the Commission points out, 80 of the 176 trades placed for the firm during the relevant period were placed as limit orders, indicating a specific purchase price. *See* SEC Post Trial Memorandum at 16, n. 13. The SEC argues that this is evidence that Slocum and Gordon were initiating security purchases for their clients and then reallocating them to the firm based on their performance rate prior to the settlement date.

Defendants counter this argument several ways. First, they point out that Slocum was never asked whether he utilized limit or market orders for firm trades, and that the SEC's numerical calculation applies Gordon's testimony of his personal trading habits to transactions made by Slocum. During the relevant time period, Gordon only initiated 62 of the firm trades at issue, and the remainder were made by Slocum. *See* Exhibit C. Of these 62, 46 included specific price information on the TE form rather than the abbreviation "MKT." *See* Defendants' Post Trial Memorandum at 24. Defendants suggest that only these 46 trades by Gordon are subject to the Commission's "limit order" analysis.

Second, Defendants argue that these trades, although placed as limit orders in a strict sense, were always intended by Gordon as firm transactions. As Defendants point out, Gordon discussed more than one concept of "limit orders" during his testimony, and the SEC's analysis does not reflect this distinction. In addition to describing a limit order as an order to purchase a specific security at a specific price,

Gordon also testified that he would utilize limit orders when buying a particular offering of securities on the market at a particular time. In such a situation, the specific price would be known at the time the order was placed, because it reflects the price offered for a particular lot of shares. Gordon described this type of limit order as follows:

[I]f I'm interested in a given trade at that particular moment, I might say to the broker, there's an offering of 20,000 shares there, I know we could fill this order with 10,000 at the price offered, 30 and-a-quarter, buy it at that price; that is a limit order, but it's also, in essence, buying the offering, but I'm limiting him to that price.

\* \* \*

[I]t's a limit order, but in a different sense. We're not waiting for the market to come to us in terms of the price dropping to our limit, we are simply buying the stock as it's offered but with limitations on it.

Trial Transcript, 7/23/03, at 120–21 (Gordon testifying). The concept of simply "buying the offering" of a security is consistent with Gordon's philosophy for firm trading. Thus, Defendants argue that some of Gordon's transactions, although initiated as limit orders, were always intended for the firm.

Defendants also point out that the SEC's designation of these 46 trades as "limit orders" only refers to the fact that the TE forms for these trades included a specified price for the transaction rather

---

11. The Commission's argument is founded in the following exchange from Gordon's testimony:

> Q. Did you use limit orders to purchase securities for the firm?
> A. Rarely. I can't think of many occasions where that would have occurred, if any.

Q. So limit orders generally were used for purchase of securities for clients?
A. Correct.

Trial Transcript, 7/22/03, at 50 (Gordon testifying).

than the designation "MKT." As Gordon testified, sometimes he would receive an execution price from a broker while he was one the telephone with him initiating the transaction. In these situations, the exact price of the order would have been available to Gordon at the time he first began to fill out the TE form. In such a situation, there would have been little need to utilize the abbreviation "MKT" on the TE form, as the price itself was available. The Commission's argument does not account for such a scenario.

Finally, Defendants argue that the Commission's limit order argument is flawed because Plaintiff applies it across the board to every firm transaction, regardless of whether the transaction was profitable. One example of this was a firm trade of Ford in 2000, *see* Exhibit D, which the SEC contends was originally placed as a limit order, and is thus indicative of cherry picking. However, this particular trade, although initiated with a specific price, resulted in a short-term loss for SG & C. Cherry picking a loss defies logic, yet Plaintiff's analysis yields such a result.

Defendants contend these examples, which create numerous exceptions to the SEC's blanket analysis, demonstrate the over-generality of Plaintiff's argument. The Court agrees.

### 3. *Irregular TE Forms*

The Commission also argues that SG & C's method of completing their TE forms is evidence of cherry picking. Specifically, the SEC suggests that Slocum and Gordon's failure to fill out the TE forms in their entirety at the time a security transaction was initiated, and their reliance on Shoemaker, created the opportunity for the forms to be doctored prior to the settlement date. According to the Commission, this makes every transaction during the relevant period suspect. Of particular

interest to the Commission is the appearance of multiple ink colors and different forms of handwriting at different places on the TE forms. The SEC argues that this ink and handwriting evidence proves that the forms were not completed when the trade was first initiated, and argues that this is evidence of a cherry picking scheme.

Defendants, however, concede that the forms were not filled out at one sitting, and admit that Shoemaker assisted the firm partners in completing TE forms on a regular basis. The evidence demonstrates that Slocum and Gordon had an established procedure for filling out the TE forms piecemeal, and that they often relied on Shoemaker to transfer data from their rough drafts to the TE forms, enter missing information on the forms, or, in some cases, to complete the forms in their entirety. Further, Shoemaker testified that she had an understanding with Slocum and Gordon that TE forms submitted to operations without a client list were intended for the firm trading account. Shoemaker also testified that she made sure the TE forms were completed and in her blue folder by the time she affirmed the trades on the day after a trade was placed, or immediately thereafter. Once these forms were completed, they were never removed from Shoemaker's custody or altered in any way, except in isolated cases to correct errors. When such an error occurred, it was noted clearly on the TE form itself.

Shoemaker testified that she was unaware of a cherry picking scheme at SG & C. As Shoemaker was involved with processing the paperwork on virtually every trade SG & C made during the relevant time period, the Court finds that no cherry picking scheme could have taken place at SG & C without her knowledge. The Commission argues that this writer should discount Shoemaker's testimony because

176

she is a long-time employee of SG & C, arguing that her working relationship with the Defendants generates bias. However, the Court does not believe that Shoemaker was a biased witness. Shoemaker was not a partner at SG & C, and did not stand to profit from the funds generated in the firm trading account. In fact, Shoemaker testified that she did not invest in the stock market at all. The only possible benefit Shoemaker could have received for her testimony was her salary as an employee of SG & C. The Court does not find this an adequate incentive for perjury. Shoemaker's testimony is uncontroverted, and the Court finds that she is a credible witness.

### 5. Cessation of Firm Trading Does Not Support Cherry Picking

Finally, the SEC suggests that SG & C's decision to stop placing short-term trades for its firm account in May 2000 constitutes evidence of cherry picking. The Commission points out that SG & C stopped engaging in firm trades only when it knew that the firm was under investigation and when it was unable to maintain commingled clearing and custodial accounts to facilitate risk free firm trades. According to the Commission, this complete cessation of firm trading demonstrates that SG & C's previous firm trades were tainted with fraud.

Slocum and Gordon testified that they stopped trading for the firm in May 2000 because the bull market of the late 1990s ended, making it a less favorable environment for momentum trading. They also testified that they were aware of the SEC's investigation into their firm trading account and that they stopped all activity in that account until they could be certain that it was clearly in compliance with all applicable laws. The Court finds both explanations reasonable.

Because the Commission failed to prove the alleged cherry picking scheme by a preponderance of the evidence, the Court finds that the Commission failed to establish a violation of the Securities Act or the Exchange Act. Therefore, the Court finds for the Defendants on Counts 1 and 2.

### B. Technical Violations

■ Counts 3, 4, 5, and 6 of the Commission's Complaint relate to the Defendants' operating practices, account structure, and duties of disclosure as investment advisers. Because SG & C was an investment advising firm registered under the federal Advisers Act, the firm is subject to the different statutory requirements of the Act and all regulations promulgated under its auspices. The Commission argues that Defendants' style of operations and its account structure were contrary to these rules and regulations. Furthermore, as registered investment advisers, the Defendants acted as fiduciaries in their dealings with clients, and owed their clients an affirmative obligation of "utmost good faith and full and fair disclosure." *Capital Gains Research Bureau, Inc.*, 375 U.S. at 194, 84 S.Ct. 275. The SEC argues that Defendants breached these duties by withholding material facts from their clients and the Commission.

Because the Commission argues that Defendants' conduct resulted in multiple violations of the Advisers Act, this writer will discuss each potential violation individually.

### 1. Commingling

The Commission's most meritorious allegation, concerns the bank account structure in place at SG & C during the relevant time period. In Count 4 of its complaint, the Commission contends that

SG & C's practice of maintaining a single clearing account at Fleet and a single custodial account at IBT, then routing both firm assets and client assets through these accounts simultaneously, constituted commingling of client and firm funds in violation of Section 206(4) of the Advisers Act and Rule 206(4)–2(a) thereunder. *See* 15 U.S.C. § 80b–6(4) (1997); 17 C.F.R. § 275.206(4)–2(a)(2) (2003).[12] The statute and its accompanying regulation, read, in pertinent part, as follows:

*Section 206(4):*

**Prohibited transactions by investment advisers**

It shall be unlawful for any investment adviser, ... directly or indirectly ...

(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 80b–6(4) (1997).

*Rule 206(4)–2(a):*

**Custody or possession of funds or securities of clients.**

(a) It shall constitute a fraudulent, deceptive, or manipulative act, practice or course of business within the meaning of section 206(4) of the Act (15 U.S.C. 80b–6(4)) for any investment adviser registered or required to be registered under section 203 of the Act (15 U.S.C. 80b–3) who has custody or possession of any funds or securities in which any client has any beneficial interest, to do any act

or take any action, directly or indirectly, with respect to any such funds or securities, unless:

(1) All such securities of each such client are segregated, marked to identify the particular client who has the beneficial interest therein, and held in safekeeping in some place reasonably free from risk of destruction or other loss; and

(2)(i) All such funds of such clients are deposited in one or more bank accounts which contain only clients' funds....

17 C.F.R. § 275.206(4)–2(a) (2003).

Pursuant to Section 206(4) and Rule 206(4)–2(a), investment advisers who have custody of client funds must deposit them into one or more bank accounts containing only client funds. Although the Rule speaks verbatim of the initial deposit of client funds into a separate account from firm funds, Rule 206(4)–2(a) has been interpreted by the Commission as requiring investment advisers to maintain client assets in bank accounts separate and apart from those of the firm, and to refrain from commingling firm and client assets. *See SEC v. Giacchetto*, Lit. Rel. No. 17092, 2001 WL 879799 (Aug. 6, 2001), 2001 SEC LEXIS 1572; *In the Matter of Vigil Asset Mgt. Group, Inc.*, Advisers Act Rel. No. IA–1621, 1997 WL 120698 (Mar. 17, 1997), 1997 SEC LEXIS 606. This position has also been embraced by courts evaluating the issue. *See SEC v. Steadman*, 967 F.2d 636, 646 (D.C.Cir.1992) (interpreting Rule 206(4)–2(a)(2) as requiring investment advisers to keep and maintain "separate bank accounts that contain only client funds"). Moreover, scienter is not re-

---

**12.** Shortly after the trial in this case, the Commission promulgated a new version of Rule 206(4)–2(a), which became effective November 5, 2003. *See* 17 C.F.R. § 275.206(4)–2(a)(2) (2004).

quired for a violation of Section 206(4). *Id.* at 647.

At trial, every witness asked about the account structure at SG & C was forced to admit that both client assets and firm assets were in the clearing account and the custodial account at the same time. Indeed, the commingling in these two accounts is further demonstrated by Defendants' Exhibit P, which was introduced at trial. Exhibit P clearly demonstrates that cash flowed from both the client accounts at Merrill Lynch and the firm's line of credit at Sovereign through the Fleet clearing account and into the same custodial account, and vice versa. However, in spite of this testimony, Defendants argue that this Court should still rule that Defendants' account structure satisfied the requirements of Rule 206(4)–2(a)(2).

First, Defendants argue that SG & C's practices satisfied Rule 206(4)–2(a)(2) because client funds entering the Fleet account and the IBT account were not "deposited" into these accounts, but rather merely "routed" through these accounts on their way to eventually be used by IBT to purchase client securities. Similarly, Defendants argue that after a sale, the client funds were again merely "routed" through these accounts en route to the different individual accounts maintained for clients at Merrill Lynch. Defendants argue that the Rule imposes a "deposit requirement" that the SEC is "creatively ignoring" in its assignment of a violation. The Court disagrees.

This writer believes that Rule 206(4)–2(a)(2) was intended to prevent investment advisers from commingling firm and client assets in any fashion, whether it be for a short period of time or an extended period. As the United States Supreme Court recognized in *SEC v. Capital Gains Research Bureau, Inc.*, the Advisers Act was originally established to eliminate certain abuses in the securities industry, ensuring that "the highest ethical standards prevail[ed]." 375 U.S. at 186, 84 S.Ct. 275. Therein, the Court also recognized that sound management of investment accounts by advisers could not be achieved "unless all conflicts of interest between the investment counsel and the client were removed." *Id.* at 187, 84 S.Ct. 275. Whether deposited into a single account or "routed" there, even if only for a short period, commingling client assets with firm assets in any fashion still creates a prohibited conflict of interest. Further, this Court is not persuaded that "routing" is any different in practical bank terminology than "depositing," since both are merely methods for infusing a bank account with funds. Here, multiple witnesses working at SG & C testified that firm assets and client assets were commingled in the Fleet and IBT accounts. The Court refuses to split hairs over terminology, and thus rejects Defendants' argument.

Second, Defendants argue that even if the Court rules that "routing" and "depositing" are synonymous, this writer should still rule that the Commission failed to demonstrate a violation of Rule 206(4)–2(a)(2) because no evidence was produced demonstrating a specific example, or point in time, when client assets and firm assets were commingled. Defendants argue that in order to establish this violation, the SEC must produce "specific, simultaneous transmittals" into the different accounts of both firm and client assets. However, in so arguing, Defendants fail to note that their own witnesses testified that both client and firm funds were in the Fleet and IBT accounts at the same time, and that Exhibit P clearly demonstrates the joint use of these accounts for both firm and client assets simultaneously. Thus, the Court also rejects this argument.

■ Finally, Defendants argue that no liability for a Rule 206(4)–2(a)(2) violation should attach because the SEC tacitly approved SG & C's account structure on two occasions: first, in 1988, when Gordon wrote his letter explaining the new custodian account structure the firm was instituting,· and the SEC issued no negative commentary; and second, when the· SEC failed to raise an issue regarding the account structure during their 1994 examination. Defendants argue that the SEC tacitly consented to SG & C's structure and its reliance on the Gardner and Preston Moss No–Action Letter by failing to notify SG & C that the account structure was inappropriate. The Commission counters this argument by pointing out that SG & C never requested its own No–Action Letter from the SEC, and none was issued, thus it is not estopped from bringing this cause of ‗ action. In addition, the Commission notes that Gordon's 1988 letter to the SEC, which describes SG & C's new custodial account structure and its reliance on the Gardner and Preston Moss No–Action Letter, makes no mention whatsoever of firm funds, and completely fails to disclose the fact that funds from the firm's line of credit would be routed through the same clearing and custodial accounts established for clients. *See* Exhibit 39. Thus, the Commission argues it was not on notice of SG & C's use of a single clearing account and a single custodial account for both firm and client transactions, and did not tacitly approve it.

Here, the Court agrees with the Commission. Because SG & C failed to request and receive their own No–Action Letter, they had no assurance from the SEC that their new account structure was compliant with the Advisers Act. Further, the Court finds no evidence that SG & C affirmatively disclosed their account commingling to the Commission prior to the 2000 examination. Gordon's 1988 letter,

entered into evidence as Exhibit 39, makes no·mention of firm trades being·facilitated through the same custodial account instituted for clients. In addition, although the 1994 SEC examination resulted in no negative commentary on SG & C's account structure, the Court finds no evidence that the simultaneous use of the Fleet and IBT accounts for both firm and client transactions was disclosed to the SEC at this time. While Gordon testified that the SEC investigators were "aware" of SG & C's firm trading in 1994, no evidence has been produced establishing that the SEC investigators were made aware of and then approved the commingled account structure. The mere fact that SG & C's rule violation was not recorded earlier does not excuse it.

Thus, for the aforementioned reasons, the Court rules that Defendants' account structure violated Section 206(4) of the Advisers Act and Rule 206(4)–2(a)(2)promulgated thereunder, and finds in favor of the Commission on Count 4.

## 2. *TE Forms*

■ In Count 5, the Commission argues that Defendants violated Section 204 of the Advisers Act and Rule 204–2(a)(3)issued thereunder. *See* 15 U.S.C. § 80b–4; 17 C.F.R. § 275.204–2(a)(3). Section 204 requires a registered investment adviser to "make and keep" such records "as the Commission, by rule, may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 80b–4. Rule 204–2(a)(3) requires that every registered investment adviser "make and keep true, accurate, and current" books and records, including a "memorandum of each order given by the investment adviser for the purchase or sale of any security." 17 C.F.R. § 275.204–2(a)(3). According to the Rule, this memorandum must include the person

who placed the order, the account for which entered, and the date of entry. *See id.* SG & C's method for generating a "memorandum of each order" for a security purchase was the TE forms, which Slocum and Gordon began to fill in as they initiated a purchase with a broker and then completed, either personally, or with the assistance of Shoemaker, by the end of the trade day or, at the latest, by the next morning (T + 1).

The Commission argues that Defendants violated Section 204 and Rule 204–2(a)(3) by failing to fill in all the required information on the TE form at the moment that an order was first initiated with a broker. According to the SEC, because Defendants' TE forms were not fully prepared at the time the orders were placed, and were sometimes, in the case of firm trades, intentionally left blank in reliance on an understanding with Shoemaker, these forms were not "true, accurate, and current" as described in Rule 204–2(a)(3).

Defendants argue that the TE forms utilized by SG & C, although not filled in immediately when an order was first initiated, were still sufficiently "current" so as to satisfy the Rule. In so arguing, Defendants cite to testimony from Slocum, Gordon, and Shoemaker that TE forms were usually completed by the end of a given trade day, and that in no case was a TE form left in an incomplete condition past the morning of the day after the trade was initiated (T + 1). Defendants point out that Rule 204–2(a)(3) says "current," not contemporaneous, and suggest that their record-keeping methods fulfilled this requirement.

Here, the Court agrees with Defendants that their TE forms, which included all of the necessary information, were appropriately filled out and kept by SG & C close enough in time with their transactions for the firm's records to be described as "true,

accurate, and current." The Court is not troubled by the partners reliance on Shoemaker, a long-time employee and seasoned Operations Manager, to assist them in filling out the necessary information on the TE forms, or by the fact that these forms were completed over the course of a number of hours before they entered the blue folder in the Operations Department. The Commission produced no evidence at trial to suggest that SG & C ever failed to complete their TE forms within hours, or, at most, a day after the trade was placed. Indeed, this writer is confident that many offices that remain much less current than the operations department at SG & C, would not consider themselves remiss in their record-keeping.

Thus, after considering the evidence, the Court concludes that SG & C did not violate Section 204 of the Advisers Act and Rule 204–2(a)(3) promulgated thereunder, and rules in favor of the Defendants on Count 5.

### 3. *ADV Forms and SEC Disclosures*

■ Count 6 of the Commission's Complaint alleges that Defendants SG & C and Gordon violated Section 207 of the Advisers Act by willfully making untrue statements of material fact or willfully omitting material facts from reports filed with the SEC. 15 U.S.C. § 80b–7 (1997). The language of the statute is as follows:

**Material misstatements**

It shall be unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission under section 80b–3 or 80b–4 of this title, or willfully to omit to state in any such application or report any material fact which is required to be stated therein.

15 U.S.C. § 80b–7 (1997).

Under Rule 204–1(c), an adviser's ADV Form and any amendment thereto is

deemed to be a "report" for purposes of Section 207. *See* 17 C.F.R. § 275.204–1(c). Thus, under Section 207, the Defendants had a duty to file a copy of their ADV Form with the Commission each year that was not intentionally false or misleading, and that did not willfully omit material facts required to be disclosed therein. As the Commission points out, one of the things the ADV Form required SG & C to disclose was "what restrictions or internal procedures, or disclosures are used for conflicts of interest in" transactions where the firm buys and sells for itself the same securities that it recommends to clients.

The Commission argues that Defendants violated Section 207 by failing to disclose the following information to the Commission on SG & C's annual ADV Form: (1) the conflict of interest arising from SG & C's cherry picking scheme; (2) that SG & C was "deferring" allocation of trades until some period after the trade was placed to facilitate cherry picking; and (3) SG & C's utilization of commingled clearing and custodial accounts for firm trades. As Defendants point out, the first two of these alleged omissions are contingent on this Court finding that a cherry picking scheme existed at SG & C. Because the Court finds that the Commission failed to meet its burden of proof on the issue of cherry picking, this writer is compelled to conclude that Defendants were not required to disclose unproven cherry picking activities on reports filed with the Commission. Thus, this argument fails.

The third item the Commission suggests Defendants were required to disclose on their filings was their utilization of commingled bank accounts in their firm trades. Plaintiff argues that SG & C's disclosure elsewhere on the Form that it was engaging in short-term trading for the firm's benefit was inadequate, because it failed to reveal the fact that SG & C routed funds for both these firm trades and client trades through the same accounts. However, in so arguing, the Commission fails to establish that Defendants willfully or intentionally omitted the commingled account structure from their filings.

The language in the ADV Form that the SEC argues compelled this disclosure referred not to bank accounts or to the process by which SG & C facilitated firm trades, but rather asked Defendants to disclose the procedures the firm employed to address conflicts of interest created by engaging in firm trading and client trading simultaneously. Gordon, who prepared the ADV Form for SG & C, testified that he believed SG & C's account structure was in compliance with the SEC at the time. This assumption was supported by both the two previous SEC examinations, which failed to note SG & C's account structure as a problem, and the firm's annual surprise examination by independent auditors Deloitte & Touche, which also failed to identify SG & C's account structure as a questionable practice. Indeed, Gordon testified that he believed SG & C's account structure was based on the Gardner and Preston Moss No–Action Letter issued by the SEC in 1982. *See also* Exhibits AA and 39. Gordon's testimony on these issues was unrebutted by the Commission, and the Court finds Gordon's reliance on these external evaluations reasonable.

In light of the foregoing, the Court is not persuaded that Gordon knew that the SG & C account structure in place at the time violated federal securities laws. Thus, the Court cannot conclude that he intentionally failed to disclose or willfully omitted this information from the firm's filings. Whether Gordon acted with the requisite mental state for his actions to constitute a violation of the Advisers Act is

a question of fact. *Valicenti Advisory Services, Inc. v. SEC,* 198 F.3d 62, 65 (2d Cir.1999). Here, the Court does not find that Gordon intentionally or willfully omitted material facts from his SEC filings. As willfulness is an element of a Section 207 violation, *see* 15 U.S.C. 80b–7, the Court concludes that the Commission failed to meet its burden on this claim, and rules in favor of the Defendants on Count 6.

### 4. *Client Disclosures*

■ The Commission also alleges that SG & C violated Sections 206(1) and 206(2) of the Advisers Act.[13] 15 U.S.C. §§ 80b–6(1) and 80b–6(2). Section 206(1) makes it unlawful for any investment adviser, directly or indirectly, to employ any device, scheme, or artifice to defraud. Section 206(2) prohibits investment advisers from engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client. The United States Supreme Court has interpreted Section 206(2) as imposing a fiduciary duty on investment advisers, requiring an affirmative obligation of the utmost good faith, as well as full and fair disclosure of all material facts to an investment adviser's clients. *Capital Gains Research Bureau, Inc.,* 375 U.S. at 194, 84 S.Ct. 275.

■ Scienter is required for a Section 206(1) violation, but is not required for a Section 206(2) violation. *Steadman v. SEC,* 603 F.2d 1126, 1134 (5th Cir.1979), *aff'd,* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981); *Capital Gains Research Bureau, Inc.,* 375 U.S. at 191–92, 84 S.Ct. 275. Thus, to demonstrate a Section 206(1) violation, the Commission must show that the Defendants willfully or recklessly employed a device, artifice, or

scheme to defraud. However, to establish a violation of Section 206(2), the Commission must show that Defendants failed to disclose or omitted material facts in their dealings with clients. As stated previously, a fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making his or her decision to buy or sell a security. *Basic, Inc.,* 485 U.S. at 231–32, 108 S.Ct. 978; *Fife,* 311 F.3d at 9. Potential conflicts of interest are always material. *Vernazza v. SEC,* 327 F.3d 851, 859 (9th Cir.2003); *Capital Gains Research Bureau, Inc.,* 375 U.S. at 201, 84 S.Ct. 275.

At trial, the Commission argued that Defendants' cherry picking activities constituted a violation of Section 206(1). Because Section 206(1) requires the Court to find that Defendants willfully employed a device, scheme, or artifice to defraud their clients, in order to meet their burden of proof on this claim the Commission had to first prove that a cherry picking scheme existed. Because the Court concludes that the Commission failed to establish a cherry picking scheme, the Commission's claim under Section 206(1) fails as well. Thus, the Court turns to the SEC's claim under the second part of the statute, Section 206(2).

■ The Commission argues that Defendants violated Section 206(2) by failing to disclose their commingled account structure to their clients. Plaintiff's argument on this issue revolves around the Defendants' role as fiduciaries. The Commission argues that the commingled account structure at SG & C created a potential conflict of interest, and that Defendants' fiduciary duty required them to disclose this material fact to their clients. The Commission also argues that Defendants' success rate for its firm trades constitutes

---

**13.** These allegations are located in Count 3 of the Commission's Complaint.

a material fact, and that Defendants violated Section 206(2) by failing to disclose this information to their clients. Defendants attempt to counter these arguments by claiming that the information SG & C released to clients in its firm brochure adequately described the short-term trading program utilized for firm trades, and that the firm's success rate was not a material fact that they were required to release to clients.

As stated previously, scienter is not required for a violation of Section 206(2). The section reads as follows:

**Prohibited transactions by investment advisers**

It shall be unlawful for any investment adviser, ... directly or indirectly—

\* \* \*

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client....

15 U.S.C. § 80b–6(2) (1997).

The United States Supreme Court has interpreted this statute as requiring investment advisers to make full and fair disclosure to their clients of all material facts, including an adviser's "personal interests in [his] recommendations to clients." *Capital Gains Research Bureau, Inc.*, 375 U.S. at 201, 84 S.Ct. 275. In addition, that Court specifically held investment advisers responsible for disclosing potential conflicts of interest to their clients, even when there was no intent to defraud on the part of the advisers, and even when the advisers' actions did not result in a loss to their clients. *See id.* at 200–01, 84 S.Ct. 275. Discussing an investment adviser's duty to disclose, the Court made the following observations:

"The Investment Advisers Act of 1940 was 'directed not only at dishonor, but also at conduct that tempts dishonor.' Failure to disclose material facts must be deemed fraud or deceit within its intended meaning, for, as the experience of the 1920's and 1930's amply reveals, the darkness and ignorance of commercial secrecy are the conditions upon which predatory practices best thrive....The statute, in recognition of the adviser's fiduciary relationship to his clients, requires that his advice be disinterested. To insure this it empowers the courts to require disclosure of material facts. It misconceives the purpose of the statute to confine its application to 'dishonest' as opposed to 'honest' motives. As Dean Shulman said in discussing the nature of securities transactions, what is required is 'a picture not simply of the show window, but of the entire store \* \* \* not simply truth in the statements volunteered, but disclosure.'"

*Id.* at 200–01, 84 S.Ct. 275 (internal citations omitted).

Here, Defendants, in failing to disclose their practice of routing firm and client assets through the same clearing and custodial accounts, failed to disclose information to their clients regarding a potential conflict of interest. Indeed, the commingled account structure at SG & C created an environment where cherry picking could have occurred to the detriment of clients. Although the Court finds that no fraud was proven at trial, the commingled account structure still constituted a conflict of interest that SG & C was required to disclose to its clients. As fiduciaries, and under the Advisers Act, Defendants were required to disclose all potential conflicts of interest to their clients. *See Vernazza*, 327 F.3d at 859. Although Gordon testified that he was unaware that the account structure violated federal securities laws, he nevertheless admitted at trial that he was aware that both client and firm assets

were in the clearing and custodial accounts at the same time. The fiduciary duty imposed on Defendants compelled disclosure of this commingling to firm clients. Because the Court concludes that SG & C failed to adequately disclose its commingled account structure, the Court finds that it committed a violation of Section 206(2) of the Advisers Act. 15 U.S.C. § 80b–6(2).

■ The Commission also argues that SG & C's success rate for trades in the firm account constituted a material fact that it was required to disclose to its clients. Although the Commission has demonstrated that disclosing one's success rate is allowable under the rules, provided that an investment adviser does so without creating a false impression among his or her clients, see 17 C.F.R. § 275.206(4)–1, it has not demonstrated any provisions requiring such a representation from SG & C in its brochure or advertisements. The evidence showed that SG & C attracted most of its clients through word-of-mouth advertising. The only physical advertisements that were mentioned in the trial testimony were business card style ads taken out in publications produced by SG & C's organizational clients, such as the Newport Preservation Society. None of these advertisements included information regarding SG & C's success rate for either the firm or clients—both of which were considerably high. Because SG & C maintained a high success rate for both its clients and the firm during the relevant period, the Court is not persuaded that SG & C's firm trading success rate constituted a material fact requiring disclosure. Thus, the Court does not find that SG & C was required to disclose its successes in firm trading to its clients, and concludes that this omission did not constitute a violation of Section 206(2).

In light of the foregoing analysis, as to Count 3 of the Complaint, the Court rules in favor of Plaintiff in part and Defendants in part. The Court concludes that SG & C was required to disclose its commingled account structure to its clients. See 15 U.S.C. § 80b–6(2). As it failed to do so, the Court must find that there was a violation under Section 206(2) of the Advisers Act. However, since the Court concludes that the Commission failed to establish that a cherry picking scheme existed at SG & C, no violations of Section 206(1) occurred.

## C. Aiding and Abetting

■ Counts 7 and 8 of the Commission's Complaint allege that Defendants Slocum and Gordon aided and abetted SG & C in its violations of the Advisers Act. In order to establish aiding and abetting liability, the Commission must demonstrate: (1) a primary or independent securities law violation by an independent violator; (2) the aider and abettor's knowing and substantial assistance to the primary securities law violator; and (3) awareness or knowledge by the aider and abettor that his role was part of an activity that was improper. See U.S. SEC v. Fehn, 97 F.3d 1276, 1288 (9th Cir.1996); Cleary v. Perfectune, Inc., 700 F.2d 774, 777 (1st Cir.1983). While it is unnecessary to show that an aider and abettor know he was participating in or contributing to a securities law violation, there must be sufficient evidence to establish "conscious involvement in impropriety." Monsen v. Consolidated Dressed Beef Co., 579 F.2d 793, 799 (3d Cir.1978). This involvement may be demonstrated by proof that the aider or abettor "had general awareness that his role was part of an overall activity that [was] improper." SEC v. Coffey, 493 F.2d 1304, 1316 (6th Cir.1974).

As stated previously, before aiding and abetting liability can attach, there must be a finding of a primary violation of federal securities laws by an independent violator. Because the Court finds that the Commission has failed to meet its burden of proof as to Counts 1, 2, 5, and 6, no aiding or abetting liability can be assigned on these Counts. The Commission has only established technical violations of Sections 206(2) and 206(4) of the Advisers Act, and Defendants' failure to comply with Rule 206(4)–2(a)(2). None of these provisions require scienter for liability to arise thereunder.

██ Because the Court finds that neither Slocum nor Gordon acted with scienter, or a "mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst*, 425 U.S. at 193 n. 12, 96 S.Ct. 1375, the Court cannot find they had a conscious awareness that SG & C was engaged in operating practices that created a potential conflict of interest. During the relevant time period, SG & C was subject to external examinations from both its own independent auditors and the SEC. Neither authority identified SG & C's account structure as a potential problem. The evidence demonstrated that when potential compliance issues were brought to SG & C's attention, Gordon took steps to remedy the situation by reformulating SG & C's practices. The evidence also showed that Slocum and Gordon communicated with and relied on the advice of outside counsel in creating its account structure initially, and then in reforming it after the SEC's examination in 1988. No evidence suggests that either Slocum or Gordon had knowledge that SG & C's account structure was improper, or that their account structure created a potential conflict of interest.

As a result, the Court is not persuaded that Slocum and Gordon had the requisite mental state to have aided and abetted SG & C's non-scienter-based violations of Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)–2(a)(2) issued thereunder. Thus, as no aiding and abetting was established, the Court rules in favor of Defendants on Counts 7 and 8.

### D. *Relief Requested*

██ As discussed herein, the Court has found a violation of Sections 206(2) and 206(4) of the Advisers Act and Rule 206(4)–2(a)(2) issued thereunder. The SEC, has requested that this Court issue a permanent injunction enjoining Defendants from engaging in further violations of federal securities laws. *See* 15 U.S.C. § 80b–9(d). The legal standard applied to determine whether injunctive relief is warranted is whether there is a reasonable likelihood that the defendant will engage in future violations of the law. *See Steadman*, 967 F.2d at 647. In order for a court to issue a permanent injunction "[t]here must be 'some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'" *Id.* at 648 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). Relevant factors to consider when assessing whether a future violation is likely are (1) whether the defendant's violation was part of a pattern or an isolated incident; (2) whether a violation was deliberate or merely technical in nature; and (3) whether the defendant's business will present opportunities for future violations of the law. *Id.* (citing *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1228 (D.C.Cir.1989)).

██ Here, after evaluating these factors, the Court opines that a permanent injunction against Defendants is unnecessary. Their only securities violations were non-scienter based, technical violations. The SEC was unable to demonstrate that

Defendants were aware that their account structure was improper before the Commission brought it to their attention in 2000. When they were informed of a potential violation, however, SG & C, Slocum, and Gordon took every step possible to rectify the situation as quickly as possible. Within a matter of months, SG & C had voluntarily moved all of its client accounts and its firm account to Fidelity Investments. The evidence showed that these accounts are now completely segregated within Fidelity. As a result of the move to Fidelity, SG & C no longer needed its previous accounts at Merrill Lynch, Fleet, or IBT. These accounts no longer exist. SG & C also discontinued its use of Wanton & Co., its registered nominee. All SG & C security transactions now are facilitated through segregated accounts at Fidelity. With the account structure at SG & C fundamentally restructured through Fidelity, the Court concludes that the possibility for future commingling violations are nonexistent or slim at the very worst.

SG & C's other violation concerns its failure to disclose the potential conflict of interest generated by routing both client assets and firm assets through the same clearing and custodial accounts. Here, the Court found that SG & C had a fiduciary duty to disclose all potential conflicts of interest to its clients, regardless of whether it had an intent to defraud. However, as the accounts giving rise to this breach no longer exist, the Court sees no likelihood that Defendants will have the opportunity to omit this material information in their future dealings with clients. These violations were not deliberate, and therefore an injunction is not warranted.

▮ Another form of relief the Commission requests are civil penalties against each Defendant. Section 209(e) of the Advisers Act authorizes the Court to impose civil penalties against the Defen-

dants for their respective violations. 15 U.S.C. § 80b–9(e). Civil penalties under the Advisers Act are divided into three possible tiers, each with a higher penalty attached to it. In the First Tier, the amount imposed for each violation "shall not exceed the greater of (i) $5,000 for a natural person or $50,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 80b–9(e)(2)(A). The Second Tier imposes higher penalties per violation, but may only be invoked if the violation "involved fraud, deceit, manipulation, or a deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 80b–9(e)(2)(B). The Third Tier imposes significantly higher penalties, but only applies if the violation satisfies all the requirements for the second tier and, in addition, the Court concludes that the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 80b–9(e)(2)(C).

The Commission argues that the Court should apply the third tier to Defendants' respective violations, arguing that their actions were both deliberate and resulted in substantial losses to their clients. However, because no losses were demonstrated, and because this Court concludes that Defendants' actions were not intentional or deliberate, second and third tier penalties are inappropriate. Rather, the Court will impose a civil penalty under the first tier only.

In assigning the appropriate amount of a civil penalty under Section 209(e), the Court has discretion to arrive at a figure within the proscribed limitations "in light of the facts and circumstances" presented. 15 U.S.C. § 80b–9(e)(2)(A). Here, the Court has determined that SG & C violated Sections 206(2) and 206(4) of the Advisers' Act, and Rule 206(4)–2(a)(2) promul-

gated thereunder. These claims arise from Counts 3 and 4 of Plaintiff's Complaint, which were alleged against SG & C alone. Pursuant to the Act, civil penalties are to be assigned per violation. *See* 15 U.S.C. § 80b–9(e)(1) ("Whenever it shall appear to the Commission that any person has violated any provision of this subchapter, [or] the rules or regulations thereunder ... the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation.").

In light of the evidence presented, the Court imposes a civil penalty of $1,000 against SG & C for each respective violation. Although one course of conduct resulted in Defendants' violation of both Section 206(4) and Rule 206(4)–2(a)(2), this writer considers each provision violated, and imposes separate civil penalties. Thus, in light of the three independent violations by SG & C, the Court imposes a $3,000 civil penalty on the firm for its infractions. Because Defendants' violations were not willful, and as no actual loss to clients resulted, the Court finds that this nominal penalty is appropriate.

### Conclusion

For the aforementioned reasons, the Court's decision is essentially for the Defendants and only in minor part for Plaintiff. As to Counts 1, 2, 5, 6, 7 and 8, the Court finds that Plaintiff has failed to establish the securities violations alleged by a preponderance of the evidence, and thus rules in favor of Defendants on each of these Counts. Therefore, judgment shall enter for Defendants on those counts.

The Court also finds that Plaintiff failed to establish the first portion of its claim in Count 3, a violation of Section 206(1) of the Advisers' Act, as this claim requires scienter so judgment shall enter for SG & C on that claim. As to the remainder of Count 3 and Count 4, the Court finds that Plain-

tiff has met its burden of proof, and finds for the Commission as described herein. In light of these rulings, the Court imposes a civil penalty, pursuant to 15 U.S.C. § 80b–9(e), against Defendant SG & C in the total amount of $3,000. Therefore, judgment shall enter for Plaintiff against Defendant Slocum, Gordon & Company in the total amount of $3,000 on the proven claims in Counts 3 and 4.

The Clerks shall enter judgement as indicated forthwith.

It is so ordered.